**No. 25-10573**

In the
**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

**In the Matter of With Purpose, Incorporated,**
*Debtor.*

**With Purpose, Incorporated; WPI Collateral Management, L.L.C.,**
*Appellants,*

***v.***

**Scott M. Seidel, Trustee; GloriFi Acquisitions, L.L.C.; Jackson Investment Group, L.L.C.,**
*Appellees.*

**On Appeal from the United States Bankruptcy Court**
**for the Northern District of Texas, Dallas Division**
*Honorable Michelle V. Larson, Bankruptcy Judge*
Case No. 23-30246-MVL-7

**BRIEF OF APPELLANT WITH PURPOSE, INCORPORATED**

**Jeffrey S. Levinger**
State Bar No. 122588300
jlevinger@levingerpc.com
**J. Carl Cecere (of Counsel)**
State Bar No. 24050397
ccecere@cecerepc.com
**Levinger PC**
1700 Pacific Ave., Suite 2390
Dallas, TX 75201
Telephone: 214-855-6817
Facsimile: 214-817-4590

*Counsel for With Purpose, Inc.*

**CERTIFICATE OF INTERESTED PERSONS**

No. 25-10573; *With Purpose, Incorporated, et al. v. Scott M. Seidel, et al.*

The undersigned counsel of record certifies that the following listed persons and entities covered under 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**1.     Appellants:**

With Purpose, Incorporated
WPI Collateral Management, L.L.C.

**2.     Counsel for Appellants:**

Jeffrey S. Levinger
J. Carl Cecere (of Counsel)
Levinger PC
1700 Pacific Ave., Suite 2390
Dallas, TX 75201
*(Counsel for WPI)*

Ryan Downton
The Texas Trial Group
875 Carr 693, Ste. 103
Dorado, PR 00646
*(Counsel for WPI Collateral Mgt.)*

**3.     Appellees:**

Scott M. Seidel, Trustee
GloriFi Acquisitions, L.L.C.
Jackson Investment Group, L.L.C.

**4.     Counsel for Appellees:**

Davor Rukavina
Thomas D. Berghman
Munsch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
*(Counsel for Seidel)*

Paul M. Rosenblatt
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
*(Counsel for GloriFi Acquisitions and J.I.G.)*

i

**5.      Other Potentially Interested Persons or Entities:**

Toby Neugebauer
Benzai Advisory Group, LLC
Benzai Capital Partners, LLC
Neugebauer Family Enterprises, LLC

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

*Counsel for With Purpose, Inc.*

**STATEMENT REGARDING ORAL ARGUMENT**

Pursuant to 5TH CIR. R. 28.2.3, Appellant With Purpose, Inc. ("Debtor" or "WPI") requests oral argument. This appeal involves two separate but related bankruptcy-court orders—one denying the Debtor's motion to convert the case from a Chapter 7 to a Chapter 11 (which is addressed in this brief), and a second approving a private agreement between the Chapter 7 trustee and a party claiming to be an unsecured creditor (which is addressed in the brief filed by WPI Collateral Management, LLC (the "Collateral Agent")). These briefs raise an assortment of bankruptcy-law issues that are novel, important, and complex. And the record on appeal is voluminous, consisting of over 30,000 pages of pleadings, hearing transcripts, exhibits, and court orders. Because of the legal issues and the voluminous record, the Debtor believes that oral argument will assist the Court in resolving the issues in this case.

## TABLE OF CONTENTS

Certificate of Interested Persons ...................................................................i

Statement Regarding Oral Argument ......................................................... iii

Table of Authorities ....................................................................................vi

Jurisdictional Statement ...............................................................................1

Statement of the Issues.................................................................................2

Introduction ..................................................................................................3

Statement of the Case...................................................................................6

I.      Factual History.................................................................................6

II.     Procedural History ...........................................................................8

Summary of the Argument..........................................................................18

Argument....................................................................................................21

I.      Standard of Review........................................................................21

II.     The Debtor met all the statutory conditions for converting a case from Chapter 7 to Chapter 11...........................................................................22

III.    The Bankruptcy Court erred in imposing non-statutory conditions on the decision whether to convert the case to Chapter 11. ..............................25

        A.      The Bankruptcy Court based its decision to deny conversion on non-statutory considerations of abuse of process, bad faith, and risk of futility derived from the Supreme Court's decision in *Marrama*...................................................................................25

        B.      But *Marrama*'s non-statutory conditions are not applicable here. ..........................................................................................27

                1.      *Marrama*'s conditions are applicable only to conversions from Chapter 7 to 13—not conversions from Chapter 7 to 11....................................................................................28

2.    Some of *Marrama*'s non-statutory conditions do not survive the Supreme Court's later decision in *Law v. Siegel*. ..............................................................30

    a.    *Siegel* holds that that a debtor cannot be denied rights provided under the Code as punishment for perceived "abuses" of the bankruptcy process. ..............32

    b.    *Siegel*'s reasoning fatally undermines any notion that a bankruptcy court can deny conversion based on amorphous notions of "bad faith." ............................33

3.    *Marrama* does not apply here because the Trustee admitted that the Debtor satisfies the conditions to be a debtor in Chapter 11 ................................................36

IV.    The Bankruptcy Court erred in concluding that its non-statutory conditions for denying conversion were present in this case. ........................36

A.    The Bankruptcy Court identified no evidence that the Debtor engaged in bad-faith conduct. ...........................................37

B.    The Bankruptcy Court identified no evidence that the Debtor abused the bankruptcy process. .........................................41

C.    The Bankruptcy Court identified no risk of "immediate" reconversion suggesting that conversion would be futile. ..................47

Conclusion .......................................................................................................55

Certificate of Service .......................................................................................56

Certificate Regarding Privacy Redactions And Virus Scanning ...........................57

Certificate of Compliance With Type-Volume Limit .............................................57

## TABLE OF AUTHORITIES

**Cases**

*Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust* (*In re Nat'l Gypsum Co.*),
208 F.3d 498 (5th Cir. 2000) ...............................................................21

*Clabaugh v. Grant (In re Grant)*,
658 Fed. App'x 411 (10th Cir. Sept. 20, 2016) ... ...............................................32

*Dan Thomason & Assocs., LLC v. Breakwell*,
No. 3-10-CV-00379-K, 2010 WL 3385025 (N.D. Tex. Aug. 25, 2010) .............46

*Daughtrey v. Rivera (In re Daughtrey)*,
896 F.3d 1255 (11th Cir. 2018)........................................ 21, 29, 30, 39

*In re NLG, LLC*,
No. 21-11269, 2023 WL 2053920 (Bankr. D. Del. Feb. 16, 2023) .............. 46, 51

*In re Volkswagen of Am., Inc.*,
545 F.3d 304 (5th Cir. 2008) (en banc)................................................21

*Jacobsen v. Moser (In re Jacobsen)*,
609 F.3d 647 (5th Cir. 2010)........................................................ 21, 39

*Kearney v. Unsecured Creditors Committee (In re Kearney)*,
625 B.R. 83 (B.A.P. 10th Cir. 2021)..................................................39

*Law v. Siegel*,
571 U.S. 415 (2014) ................................................................ passim

*Marrama v. Citizens Bank of Massachusetts*,
549 U.S. 365 (2007) ................................................................ passim

*Nichols v. Marana Stockyard & Livestock Mt., Inc. (In re Nichols)*,
10 F.4th 956 (9th Cir. 2021)...........................................................32

*Smith v. U.S. Bank Nat'l Ass'n (In re Smith)*,
999 F.3d 452 (6th Cir. 2021).........................................................32

*Toibb v. Radloff*,
501 U.S. 157 (1991) ................................................................3, 47

**Statutes**

11 U.S.C. § 105 ................................................................ 26, 32, 36

11 U.S.C. § 105(a) ................................................................ 31, 32

11 U.S.C. § 706 ................................................................ 25, 26, 52

11 U.S.C. § 706(a) ................................................................ passim

11 U.S.C. § 706(d) ................................................................ passim

11 U.S.C. § 1112 ................................................................ 16, 17, 27, 34

11 U.S.C. § 1112(b)(1) ................................................................ 29, 48

11 U.S.C. § 1112(b)(2) ................................................................ 29, 48, 49

11 U.S.C. § 1112(b)(4) ................................................................ passim

11 U.S.C. § 1112(b)(4)(A) ................................................................ 17, 35, 50, 55

11 U.S.C. § 1112(b)(4)(M) ................................................................ passim

11 U.S.C. § 1123(b)(1) ................................................................ 30

11 U.S.C. § 1125 ................................................................ 24

11 U.S.C. § 1126 ................................................................ 24

11 U.S.C. § 1129(a)(7) ................................................................ 24

11 U.S.C. § 1307(c) ................................................................ 26, 27, 28

28 U.S.C. § 1334 ................................................................ 1

28 U.S.C. § 157(a)-(b) ................................................................ 1

28 U.S.C. § 157(b)(2) ................................................................ 1

28 U.S.C. § 157(b)(2)(A) ................................................................ 1

28 U.S.C. § 157(b)(2)(B) ................................................................ 1

28 U.S.C. § 157(b)(2)(O) ................................................................ 1

28 U.S.C. § 158(d)(2)(A) ................................................................................1

28 U.S.C. § 1651 ...........................................................................................27

28 U.S.C. §158(d) ...........................................................................................1

**Rules**

FED. R. BANKR. P. 9019 ........................................................................ 11, 12

**Other Authorities**

2 COLLIER ON BANKRUPTCY
    ¶ 105.01[2]  (16th ed. 2013) ....................................................................32

*Bad faith*, BLACK'S LAW DICTIONARY (10th ed. 2024), ...........................38

Douglas G. Baird & Robert K. Rasmussen,
    *Chapter 11 at Twilight*, 56 STAN. L. REV. 673 (2003) .............................3

**JURISDICTIONAL STATEMENT**

1.       This appeal is from the Bankruptcy Court's Order Denying Motion to Convert Case to Chapter 11 (ROA.11805 [RE3]) and Order Granting Trustee's Motion for Approval of Compromise and Settlement with, and Sale to, Jackson Investment Group LLC (ROA.11806 [RE4]), both entered on January 24, 2025, and from the Bankruptcy Court's Memorandum Opinion on those motions entered on January 22, 2025 (ROA.11737 [RE5]).  The Bankruptcy Court had jurisdiction over this Chapter 7 case under 28 U.S.C. §§ 157(a)-(b) and 1334, and its resolution of the motions at issue involved a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O).  (ROA.11738)

2.       Appellants With Purpose, Inc. ("WPI" or the "Debtor") and WPI Collateral Management, LLC (the "Collateral Agent") timely filed an amended notice of appeal on February 5, 2025. (ROA.2335 [RE2])  Pursuant to 28 U.S.C. § 158(d), Appellants moved this Court for leave to allow a direct appeal, which this Court granted in an unpublished order on May 1, 2025.  This Court has jurisdiction over the appeal under 28 U.S.C. § 158(d)(2)(A).

1

**STATEMENT OF THE ISSUES**

Did the Bankruptcy Court improperly deny the Debtor's motion to convert the case from Chapter 7 to Chapter 11 pursuant to 11 U.S.C. § 706(a) when:

    a.  the Debtor met all the statutory conditions for conversion;

    b.  the Bankruptcy Court denied conversion based on equitable, non-statutory considerations appearing nowhere in the Code and lacking legal and evidentiary support; and

    c.  the motion to convert was supported by a restructuring support agreement, a disclosure statement, and a proposed plan of reorganization backed by all of the secured creditors, a significant number of unsecured creditors and shareholders, and a former bankruptcy judge who agreed to serve as the Debtor's chief restructuring officer in Chapter 11?[1]

---

[1] In addition to these issues, the Debtor joins the Statement of Issues contained in the Collateral Agent's appellate brief and adopts its arguments.

2

**INTRODUCTION**

It is a bedrock principle of bankruptcy law that the remedies in Chapter 11 of the Bankruptcy Code generally yield better outcomes than Chapter 7 for the estate's constituencies. Under Chapter 11, a company engages in an organized process allowing it to maintain control of its assets and "restructur[e] [its] finances" in hopes of developing a plan that will "pay its creditors[] and produce a return for its shareholders." H.R. Rep. No. 95-595, at 220 (1977). And the estate's creditors are entitled to vote on the debtor's proposed plan—allowing them to decide for themselves whether the plan maximizes recovery for the estate. In contrast, Chapter 7 allows only for dismemberment—assets are placed in the hands of a trustee and the only funds available to pay creditors come from a fire sale in which the assets are sold "piece by piece for a fraction of their value"—without input from creditors about whether the price is minimally acceptable. Douglas G. Baird & Robert K. Rasmussen, *Chapter 11 at Twilight*, 56 STAN. L. REV. 673, 679 (2003). Accordingly, "[a]llowing … a debtor to proceed under Chapter 11 serves the congressional purpose of deriving as much value as possible from the debtor's estate." *Toibb v. Radloff*, 501 U.S. 157, 163 (1991).

Recognizing these stark differences, Congress provided in section 706(a) of the Code that a debtor "may" convert a case from Chapter 7 to Chapter 11 "at any time," giving the debtor "a one-time absolute right of conversion of a liquidation

case to a reorganization." S. Rep. No. 95–989, at 94 (1978); *see also* H. R. Rep. No. 95–595, at 380 (same).  This "absolute" right of conversion is subject only to certain statutory qualifiers—basics such as whether the debtor had previously converted the case and whether it can qualify as a "debtor" under the Chapter to which it seeks conversion.  11 U.S.C. § 706(a), (d).

The Debtor in this case met all of these basic requirements to convert its case from Chapter 7 to Chapter 11; indeed, it accompanied its motion to convert with a detailed proposed plan of reorganization that not only would provide *millions* to pay the direct costs of administering the bankruptcy but potentially would yield *billions* for creditors and shareholders from litigation against various individuals and entities that allegedly contributed to the Debtor's demise.  The Debtor marshalled support for this plan from all the estate's secured creditors, many unsecured creditors, and shareholders.  Yet the Bankruptcy Court denied the Debtor's motion for conversion, instead granting approval of a private "settlement" between the Chapter 7 Trustee and one of the likely defendants in the litigation. And whereas the Debtor proposed to pursue *all* the parties responsible for its demise, the party to the agreement the court approved planned to pursue only *some* (and notably excluded itself), ensuring a manifestly lower recovery for the estate.

By denying conversion, the Bankruptcy Court deprived the Debtor's creditors of the superior remedies available in Chapter 11—including the right to vote on a

plan for recovering estate assets rather than have one imposed by judicial fiat. The Bankruptcy Court reached that result by replacing the Code's near-absolute right to conversion with a "totality of the circumstances" approach that examined the "best interests of the creditors" while ignoring the expressed preferences of those creditors themselves. And in employing this "totality of the circumstances" approach, the Bankruptcy Court acted out of its expressed desire to punish the Debtor and its majority shareholder, Toby Neugebauer, based on insupportable and legally insufficient allegations of "bad faith" and "abuse of the bankruptcy process," along with sheer speculation about how events might unfold during the Chapter 11 process.

But a debtor's near-absolute right to conversion from Chapter 7 to 11 cannot be subjected to any "totality of the circumstances" test, and should not be based on amorphous notions of bad faith or abuse of process that are aimed at punishing the debtor but end up harming the rights of creditors, shareholders, and other constituents. And the analysis should not devolve into speculation about what *might* happen during a Chapter 11 process without allowing that process to first unfold. The Bankruptcy Court's denial of the Debtor's motion to convert is simply incompatible with statutory text, precedent, and the basic rights of bankruptcy constituents.

**STATEMENT OF THE CASE**

## I.    Factual History

With Purpose, Inc. ("WPI") was founded in 2021 by Toby Neugebauer, a Dallas investor and entrepreneur, with the involvement of J. Nicholas Ayres, the former chief of staff to Vice President Mike Pence.  (ROA.16446-47, 23028) Operating under the name "GloriFi," WPI aimed to provide a comprehensive package of financial products, including credit cards, banking, insurance, mortgage, and brokerage services, to 100 million Americans looking for such services from a company that shared their conservative values.  (ROA.12529, 16419)  Neugebauer became GloriFi's majority shareholder and CEO, and within months of its launch, its valuation skyrocketed to over $1 billion.  (ROA.16419, 16440)

The strength of the GloriFi concept attracted investments from some of the biggest names in venture capital—people like Peter Thiel, a founder of PayPal and other technology companies; Vivek Ramaswamy, investor and former presidential candidate; Jeffrey Sprecher, owner of the New York Stock Exchange; Richard Jackson, owner of Jackson Healthcare; and Ken Griffin, who invested through his hedge fund, Citadel.  (ROA.16439, 25554, 25559)  Together with Neugebauer and his family, these investors and others acquired over $50 million in "Series 1" unsecured convertible notes.  (ROA.22816, 25081, 25554)

6

In early 2022, GloriFi obtained a lucrative opportunity to merge with DHC, a special purpose acquisition company, at a valuation of $1.65 billion. (ROA.26753) To raise the necessary funds and to cover GloriFi's growing operations, Neugebauer and others invested an additional $10 million in equity. (ROA.16493-94, 26065) GloriFi also sought to raise additional capital through the issuance of "Series 2" secured convertible notes. (ROA.14997) From May through November 2022, various individuals and entities—including Neugebauer and his family businesses—invested over $36 million in these Series 2 secured notes. (ROA.14823, 14823, 25169) OnPoint Companies served as the collateral agent for the secured noteholders. (ROA.14997, 20118)

While this fundraising activity was occurring, the *Wall Street Journal* began investigating GloriFi for potential misconduct. (ROA.25053) Neugebauer cooperated with the investigation and gave the WSJ reporter "every text and every email" he possessed. (ROA.26304) Although an internal investigation conducted by the law firm of Locke Lord found no evidence to support any claim against Neugebauer or GloriFi (ROA.22292), the WSJ still published an article on October 10, 2022 portraying Neugebauer and GloriFi in an unflattering light (ROA.22283). The investigations and the WSJ article itself destroyed GloriFi's ability to raise necessary funding. (ROA.11767, 25067) In short order, GloriFi's employees were

let go and OnPoint foreclosed on the company's intellectual property assets in satisfaction of $7.5 million of the total secured indebtedness. (ROA.14999, 25056)

GloriFi's demise led to recriminations about who and what had caused it. Following a thorough investigation, Neugebauer discovered that Ayres and several of the outside investors had initially sought to wrest control of GloriFi, but when that did not succeed, they caused liquidity crises and misappropriated GloriFi's confidential information and intellectual property in order to fund competing companies they had invested in, such as "Coign" and "Strive." (ROA.14995-96, 16419-20) For their part, Ayers and the outside investors, led by Richard Jackson, contended that GloriFi was the victim of Neugebauer's mismanagement and fiduciary breaches. (ROA.14996, 16073, 25615)

## II.    Procedural History

On February 8, 2023, WPI filed a voluntary Chapter 7 petition. (ROA.5259) Scott M. Seidel was appointed as the Chapter 7 Trustee. (ROA.11737) The Trustee determined that the estate's most valuable assets were its causes of action—which he valued between $1.0 billion and $4.95 billion (ROA.16084, 27881)—and concluded that "colorable causes of action exist against everyone that the proverbial finger has been pointed at, including Neugebauer and the early investors" (ROA.14996, 16061). But the Trustee (and later the Bankruptcy Court) also recognized that "[l]ooming over these disputes . . . was the fundamental questions

8

of what claims and causes of action the Estate owned, or which of the claims and causes of action, if any, were owned by the Collateral Agent." (ROA.11781, 14997) And yet the Bankruptcy Court did not attempt to resolve this critical dispute until months after entering the orders at issue in this appeal.

Controversy soon erupted over how, by whom, and against whom these causes of action should be asserted.  In April 2024, the Trustee moved for an order approving a bid procedure that would enable him to auction off the estate's causes of action.  (ROA.13388) Concerned that the proposed bid procedure did not differentiate between encumbered and unencumbered causes of action—or provide a mechanism for the Collateral Agent to credit bid on its secured interest in the collateral—the Collateral Agent (specifically WPI Collateral Management, which had replaced OnPoint) and Neugebauer objected to the Trustee's motion. (ROA.13450, 13923, 14342) When the Bankruptcy Court granted the Trustee's motion (ROA.14364), Neugebauer, his family companies, and the Collateral Agent filed a complaint in the U.S. District Court for the Northern District of Georgia asserting various statutory, tort, and contract causes of action against Ayres, a number of GloriFi's outside investors, and others (ROA.29376, 29505-39).  And Neugebauer filed his own complaint in the U.S. District Court for the District of

9

Delaware asserting that some of the same defendants had breached contracts and violated RICO. (ROA.29184, 29256-65)[2]

The complaints filed in the DEGA Litigation stated that the plaintiffs were not seeking any lost equity value in GloriFi or any other damages that might be property of the estate. (ROA.29185, 29221, 29261, 29517, 29526, 29535-36) And counsel for Neugebauer and the Collateral Agent told the Trustee about the DEGA Litigation before filing it. (ROA.26551) But on May 30, 2024, in response to the initiation of the DEGA Litigation, the Trustee filed an adversary proceeding against Neugebauer and the Collateral Agent seeking, among other relief, to resolve the disputes over ownership of the causes of action, to test the validity and extent of the Collateral Agent's security interests and prepetition foreclosure, and to hold Neugebauer and the Collateral Agent liable for allegedly violating the automatic stay. (ROA.11743, 29126; *Seidel v. Neugebauer, et al.*, No. 24-03038-MVL (Bankr. N.D. Tex.)). Ultimately, the Bankruptcy Court did not decide the adversary proceeding until months after it entered the orders at issue in this appeal.

In July 2024, with the issue of ownership of the causes of action still unresolved and with many still unasserted (but with limitations potentially looming),

---

[2] Throughout the bankruptcy proceeding, the parties and the court referred to the Delaware and Georgia lawsuits as the "DEGA Litigation" and the defendants named therein as the "DEGA Defendants." (ROA.11742) This brief will do the same.

the Debtor tried to break the logjam by filing a motion to convert the case from a Chapter 7 to a Chapter 11. (ROA.14941) Before the motion could be heard, however, the Trustee reached a settlement with Neugebauer and the Collateral Agent. (ROA.14992) In his July 17, 2024 motion for approval of the settlement under Bankruptcy Rule 9019, the Trustee summarized the key terms of the agreement:

- The adversary proceeding would be resolved by agreement of the Trustee and Collateral Agent that (a) the Collateral Agent validly foreclosed on WPI's software and software assets only; (b) the Collateral Agent did not foreclose on any causes of action, such that the estate owns whatever causes of action WPI held; and (c) the credit bid at the foreclosure sale would be reduced from $7.5 million to $4.0 million.

- The adversary proceeding would be further resolved by agreement of the Trustee and Collateral Agent that (a) the Collateral Agent's security interest extends to causes of action sounding in contract and tort when related to damages to or misappropriation of trade secrets; and (b) the Collateral Agent holds no security interests in any other tort claims.

- The claims of the secured noteholders would be allowed.

- Neugebauer would not be released from any claims, which the Trustee may prosecute or sell.

- The Collateral Agent would pay $2.25 million to the estate, which would pay all Chapter 7 administrative claims and leave $1 million to fund litigation expenses. Additionally, the Collateral Agent would fund an initial $2.25 million postpetition loan to pay litigation expenses.

- The Trustee would pay $2.5 million to the secured noteholders.

- The Trustee, the Collateral Agent, and Neugebauer would enter into a Joint Prosecution Agreement pooling their causes of action to jointly pursue them in Georgia, Delaware, and elsewhere through a special litigation counsel, with the proceeds distributed through a waterfall in which unsecured creditors would share.

(ROA.15002-03, 15012-30) The 9019 motion was set for hearing on August 15, 2024, and the Debtor's motion to convert and the Trustee's adversary proceeding were abated. (ROA.11744, 15055)

But then Jackson Investment Group ("JIG"), which was owned by Richard Jackson and was included among and aligned with the DEGA Defendants, approached the Trustee with an alternate plan (ROA.26574-75)—one that would thwart any efforts to hold JIG or the DEGA Defendants liable for GloriFi's demise. Despite having already entered into and sought court approval of the agreement with the Collateral Agent and Neugebauer, the Trustee ultimately withdrew that agreement, deemed the JIG proposal to be "better," and filed a motion on August 12, 2024 seeking "Approval of Compromise and Settlement Under Bankruptcy Rule 9019 and Sale of Assets." (ROA.16055, 16058)[3]

The Trustee summarized the key provisions of his agreement with JIG as follows:

---

[3] As discussed in detail in the Collateral Agent's appellate brief, this nomenclature is inaccurate: The JIG agreement was not a "compromise or settlement" because there was no dispute between the Trustee and JIG to compromise, and it did not purport to sell any causes of action.

- The Trustee would continue to pursue the adversary proceeding against the Collateral Agent and Neugebauer.

- JIG's Agent (GloriFi Acquisitions) would pay $100,000 to the estate to acquire the Debtor's and estate's rights in the name "GloriFi" and equity in any subsidiaries.

- JIG's Agent would pay $6 million to the estate to cover administrative claims and litigation expenses to pursue claims against Neugebauer and related parties.

- JIG's Agent and the Trustee would enter into a Joint Prosecution Agreement giving JIG's Agent sole authority to control the estate's causes of action and decide which should be prosecuted in the name of the Trustee or not prosecuted. At a minimum, JIG's Agent must assert claims against Neugebauer. No causes of action would be sold and no parties released.

- From any litigation proceeds, special litigation counsel would be paid, JIG's Agent would receive a preferential payout of $6 million plus interest, and the remainder would be distributed to JIG's Agent and the estate under a sliding-scale waterfall.

- JIG's $10 million unsecured claim would be allowed in full.

- The parties would seek a permanent stay or dismissal of the DEGA Litigation.

(ROA.16064, 16070-80, 27858-69)

Meanwhile, in response to the Bankruptcy Court's August 1, 2024 admonition that "[i]t is time at this juncture to put up or shut up" (ROA.16212), the Collateral Agent made a "final proposal" that included the following terms:

- The Collateral Agent will make a credit bid of $20 million for ownership of all causes of action in which it has a security interest in either the cause of action or the proceeds from the cause of action (the "Collateral Agent Claims").

13

- The Collateral Agent will pay the estate $750,000, with $500,000 being used to pay administrative claims and $250,000 reserved for distribution to unsecured creditors.

- If JIG matches the $750,000 payment, it will obtain ownership of the estate's causes of action against Neugebauer. If it does not match, the Collateral Agent will pay an additional $500,000 to cover administrative claims.

- A Liquidating Trust will be formed to prosecute the Collateral Agent Claims and the estate claims not purchased by the Collateral Agent or JIG (the "Unsecured Estate Claims").

- The Collateral Agent will provide the Liquidating Trust with $3 million to prosecute all claims, and will assist in obtaining additional litigation funding for attorney's fees as necessary.

- Proceeds from the Unsecured Estate Claims will be distributed under a waterfall that pays for attorney's fees, litigation costs, estate administrative claims, and unsecured claims, with any remainder going to the Collateral Agent.

(ROA.15667-69)

For its part, the Debtor amended its previously-filed motion to convert the case to a Chapter 11 pursuant to 11 U.S.C. § 706(a). (ROA.16273) This was no ordinary request for conversion: It was a well-thought-out and complete proposal that included the following features:

- A Restructuring Support Agreement signed by the Collateral Agent and the secured noteholders, several unsecured creditors holding over $5 million in claims, and a majority of WPI's shareholders. (ROA.16287-16320)

- The engagement of a Chief Restructuring Officer (former Bankruptcy Judge Leif Clark) to oversee the Chapter 11 and address any conflicts of interest. (ROA.21981, 26460)

14

- A $2 million debtor-in-possession loan facility, funded by the secured creditors and the Collateral Agent, to pay up to $1 million in Chapter 7 administrative expenses, administrative expenses incurred in the Chapter 11 case, and expenses of the Litigation Trust.  (ROA.16288)

- A plan and disclosure statement that would: (a) create a Litigation Trust to pursue all estate causes of action for the benefit of all creditors, excluding claims against Neugebauer that will be sold for at least $4 million; (b) establish a distribution waterfall for the net recoveries to the Litigation Trust; (c) provide unsecured creditors and equity interest owners beneficial interests in the Litigation Trust; and (d) settle the adversary proceeding.  (ROA.16321, 16334, 16348)

- A fully drafted complaint asserting the estate's causes of action against the DEGA Defendants.  (ROA.16418-570)

The Bankruptcy Court heard both the amended motion to convert and the motion to approve the JIG agreement over seven days in September and October 2024, eliciting testimony from a series of witnesses including former Bankruptcy Judge Clark, Neugebauer, Ayres, Jackson, the Collateral Agent's principal, and the Trustee.  (ROA.11746-54) On December 6, 2024, the court orally announced from the bench that it would deny the motion to convert and grant the JIG motion. (ROA.27377-94) The court then memorialized both rulings in a Memorandum Opinion entered on January 22, 2025.  (ROA.11737)

In denying the Debtor's motion to convert (ROA.11755-74), the Bankruptcy Court did not dispute that the Debtor met the statutory conditions in section 706(a) and (d) for conversion and therefore had an "absolute"-*seeming* right to convert the case to Chapter 11. S. Rep. No. 95–989, at 94 (1978); *see also* H. R. Rep. No. 95–

15

595, at 380. The court nevertheless held that it possessed power to deny conversion based on a series of unenumerated, non-statutory considerations it derived from the Supreme Court's 5-4 decision in *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007). (ROA.11755) The court concluded that *Marrama* allowed bankruptcy courts to deny conversion if the debtor engaged in "bad faith" or "abuse[d] the bankruptcy process." (ROA.11756-57, citing 549 U.S. at 372-74) The court also concluded that *Marrama* permitted bankruptcy courts to deny a conversion from Chapter 7 to Chapter 11 if the conversion would be "futile," and there would be "immediate" "cause" to convert the case back to Chapter 7 based on the statutory grounds for dismissal or conversion of an originally-filed Chapter 11 set forth in section 1112. And based on these non-statutory considerations, the court concluded that a debtor's absolute-seeming right to conversion was actually subject to a "totality of the circumstances" test to determine whether conversion would be in the "best interest of creditors." (ROA.11761, 11768)

In evaluating these circumstances, the Bankruptcy Court identified a "smattering" of "evidence" of "what the Court would consider both bad faith and abuse of process." (ROA.11761) Yet the court expressly declined to make any findings of bad faith (ROA.11761, 11766)—although it could not resist taking the occasion to examine Neugebauer's "psyche" and castigate him for various supposed character flaws and unsupported allegations that he had contributed to GloriFi's

16

demise. (ROA.11766-68) The court included these supposed character defects and unproven allegations in its inquiry into the "totality of the circumstances." (ROA.11761, 11767-68)

The Bankruptcy Court also concluded that the Debtor had engaged in "abuse" of the bankruptcy process as a result of the DEGA Litigation, asserting that it was intended to disrupt the Trustee's original plan to sell the estate causes of action at auction and to "cause disarray into who [between the secured creditors and the estate] own[ed] certain causes of action" that were to be part of the sale. (ROA.11762) But the DEGA Litigation was filed not by the Debtor but by Neugebauer and the Collateral Agent, and the purpose was to prevent the sale of claims in which the Collateral Agent believed the secured creditors had a security interest.

Finally, the Bankruptcy Court concluded that "there would be immediate grounds for reconversion" under section 1112, determining that the Debtor had no prospect of consummating its proposed Chapter 11 plan, which instead would drain estate assets.  (ROA.11773, citing 11 U.S.C. § 1112(b)(4)(A), (M)) But the court cited no evidence to support these conclusions beyond a set of hypotheticals about what would happen *if* conflicts of interest were to develop during the Chapter 11 proceeding, *if* a Chapter 11 trustee were appointed, and *if* the Debtor and Collateral

17

Agent proved incapable of raising the funds necessary to finance the Chapter 11 process and prosecute the estate's causes of action.

The court then used these a-textual, equitable considerations as justification for concluding that conversion was impermissible—giving no weight to the wide support the Debtor's request for Chapter 11 conversion elicited from secured creditors, many unsecured creditors and shareholders, and a former bankruptcy judge who would serve as the Debtor's chief restructuring officer. (ROA.11774) Instead, the court granted the Trustee's competing motion to approve his agreement with JIG—subject only to a minor modification requiring JIG's Agent to "reasonably consult[]" with the Trustee on decisions whether to prosecute, not prosecute, settle, or otherwise dispose of any estate causes of action. (ROA.11797-98, 27866)[4] Two days after issuing its Memorandum Opinion, the Bankruptcy Court signed orders on both motions (ROA.11085, 11806) and the Debtor and Collateral Agent timely appealed (ROA.2335).

### SUMMARY OF THE ARGUMENT

The Bankruptcy Court's refusal to grant the Debtor's motion to convert is the product of significant overreach on several different fronts—each requiring reversal. That overreach began with the court's decision to broadly apply *Marrama*'s a-

---

[4] The appeal from the order approving the JIG agreement is the subject of the Collateral Agent's appellate brief, which the Debtor joins.

textual, equitable exceptions to the Debtor's right to convert from a Chapter 7 to a Chapter 11 when those exceptions were announced in the context of a Chapter 7 to 13 conversion and are confined to the materially different statutory requirements that govern conversions in that context. But in the context of a Chapter 7 to 11 conversion, the Debtor did all the Code required it to do—and then did even more by marshalling a proposed Chapter 11 plan that was supported by the vast majority of creditors and other constituents and was opposed by only the Trustee and two DEGA Defendants who would be sued under that plan.

The Bankruptcy Court's strict adherence to the 5-4 *Marrama* decision also ignored the effect of the Supreme Court's later decision in *Law v. Siegel*, which significantly rolled back both *Marrama*'s express holding and the force of its underlying reasoning. In doing so, *Siegel* limited bankruptcy courts' authority to deny statutory rights based on a-textual considerations such as "bad faith" and "abuse of process," requiring courts to instead apply their exercises of discretion within the confines of the Code.

The Bankruptcy Court overreached again in applying *Marrama*'s non-statutory reasons for denying conversion. To the extent *Marrama*'s a-textual exceptions have any relevance in this case, they cannot be applied as part of a broad-brush "totality of the circumstances" test that would permit a bankruptcy court to merely examine whether conversion is in the "best interest of the creditors."

19

Protecting the debtor's statutory right to conversion, and preserving the interests of all constituents in the bankruptcy process, requires instead that *Marrama*'s exceptions to a debtor's right to conversion be interpreted narrowly—and applied only in "atypical" and "extraordinary" cases. Bankruptcy courts cannot be permitted to deny conversion based on a broad-brush application of amorphous notions of bad faith or abuse of process that are aimed at punishing the debtor but end up harming the rights of creditors, shareholders, and other constituents. The consequences are even worse where, as here, no evidence exists of actual bad faith or abuse of process by the Debtor.

Furthermore, as *Marrama* emphasized, and the Bankruptcy Court recognized, when a conversion to Chapter 11 is denied because of the risk that a case will be converted back to Chapter 7, such a denial is permissible only when the risk of a reconversion is unquestionable and "immediate"—based on the statutory considerations that exist at the time conversion is sought. That inquiry should not devolve into speculation about what *might* happen during a hypothetical Chapter 11 proceeding based on events that have yet to occur. Because this exact sort of speculation drove the Bankruptcy Court's conclusion that there would be "cause for reconversion," its denial of the Debtor's motion to convert must be reversed for that additional reason.

**ARGUMENT**

## I.   Standard of Review

The standard for reviewing a bankruptcy court's denial of a motion to convert a case from Chapter 7 to Chapter 11 under 11 U.S.C. § 706(a) appears to be a question of first impression in this Circuit.  In facing that unresolved question, the Eleventh Circuit concluded that the denial should be reviewed for an "abuse of discretion."  *Daughtrey v. Rivera (In re Daughtrey)*, 896 F.3d 1255, 1273 (11th Cir. 2018).  But mirroring the law of this Circuit, *Daughtrey* observed that a bankruptcy court will abuse its discretion "when it *either* misapplies the law *or* bases its decision on factual findings that are clearly erroneous."  *Id.* at 1274 (emphasis added); *see also In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc) (abuse of discretion occurs if court relies on erroneous legal conclusions, misapplies the law to the facts, or relies on clearly erroneous fact findings).  And "[i]ssues of statutory interpretation"—which are involved in this appeal—"are [questions of law] reviewed de novo."  *Jacobsen v. Moser (In re Jacobsen)*, 609 F.3d 647, 652 (5th Cir. 2010) (addressing decision to convert case from Chapter 13 to Chapter 7 and deny debtor's motion to dismiss).  The same is true of "mixed questions of fact and law."  *Century Indem. Co. v. Nat'l Gypsum Co. Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir. 2000).

II.    **The Debtor met all the statutory conditions for converting a case from Chapter 7 to Chapter 11.**

Based on the statutory requirements enumerated in the Code for conversion from Chapter 7 to Chapter 11, this should have been an easy case. Under 11 U.S.C. § 706(a), "[t]he debtor may convert a case under this chapter [Chapter 7] to a case under chapter 11, 12, or 13 of this title at any time."  With this provision, Congress intended to "give[] the debtor the one-time absolute right of conversion of a liquidation case to a reorganization or individual repayment plan case." S. Rep. No. 95–989, at 94 (1978); *see also* H. R. Rep. No. 95–595, at 380 (1977) (using nearly identical language). And it makes the question whether a case should be converted from Chapter 7 to Chapter 11 a matter lying almost entirely within the debtor's sole discretion:  The word "may" gives the debtor the election to decide whether (and when) to file a conversion motion, and the bankruptcy court is bound to allow the election, subject only to narrow statutory limitations that prohibit conversion where the case had previously "been converted" to a Chapter 7 in certain enumerated circumstances (under section 706(a)), or where the debtor seeking conversion to Chapter 11 cannot be "a debtor under such chapter" (under section 706(d)).

It is undisputed that the Debtor met all the statutory standards for conversion. The case had not previously been converted from any proceeding under Chapter 11, 12, or 13. And the Chapter 7 Trustee conceded that the Debtor was eligible to be a "debtor" under Chapter 11.  (ROA.18969) So the Debtor did all it was required to

22

do—and more—when it filed its motion to convert the case to Chapter 11. And had the motion properly been granted, the conversion would have enabled the Debtor, under the control of its Chief Restructuring Officer, former Bankruptcy Judge Leif Clark, to pay off creditors with proceeds from the prosecution of the estate's largest asset—its causes of action against the various GloriFi directors, officers, and investors who allegedly caused or contributed to its demise—ensuring that those causes of action would be asserted under control of a neutral professional. The one exception involved the claims against the Debtor's former CEO, Toby Neugebauer—and those would be sold for at least $4 million to be used to pay the costs for administering the Chapter 11 proceeding. (ROA.16321, 16334, 16348) Additional money to fund the proceeding would come from a $2 million debtor-in-possession loan facility funded by the secured creditors and the Collateral Agent. (ROA.16288)

The Debtor's proposal was supported by the Collateral Agent and the secured noteholders, several unsecured creditors holding over $5 million in claims, and a majority of WPI's shareholders, who formalized their assent through a Restructuring Support Agreement. (ROA.16287-320) And the Debtor's proposal was accompanied by a draft plan of reorganization, a draft disclosure statement, and a draft complaint by the proposed Liquidating Trust against the DEGA Defendants. (ROA.16321, 16334, 16348, 16418)

23

By contrast, the agreement between the Trustee and JIG that the Bankruptcy Court approved gutted the Debtor, transferred some of its assets (including the trade name "GloriFi") to competitors, and handed over control of its valuable causes of action to JIG, which is included among and allied with the DEGA Defendants who are the targets of those causes of action. Even the Trustee acknowledged that JIG would be unwilling to sue itself and Ayers. (ROA.26716) And true to form, while JIG's Agent has brought suit against Neugebauer, it has not sued JIG or any of the DEGA Defendants—drastically reducing the potential recovery for the estate.

This arrangement enjoyed no support from anyone other than JIG and Ayers—the same two who would not be sued under the JIG agreement. (ROA.26716) And because this agreement was entered into privately by the Trustee and approved as part of a Chapter 7 liquidation, the creditors had no real say in determining whether it should be approved—as they would have been entitled to do for a Chapter 11 plan. *See* 11 U.S.C. §§ 1125-26, 1129(a)(7) (describing the process for soliciting and counting claimholder's votes to approve or reject a Chapter 11 plan). Indeed, many of those creditors were plainly supportive of the Debtor's motion to convert.

The Trustee and JIG were able to ram through their inferior agreement only because the Bankruptcy Court enabled them to skirt the protections for creditors that exist in Chapter 11. Conversion was the only way to preserve those rights. And

24

allowing conversion should have been a foregone conclusion based on the plain language of 706(d).

## III. The Bankruptcy Court erred in imposing non-statutory conditions on the decision whether to convert the case to Chapter 11.

The Bankruptcy Court identified no reason to doubt that the Debtor satisfied each of the statutory conditions for conversion set forth in section 706. Yet the court concluded that it could deny conversion to Chapter 11 nevertheless, based on a series of considerations appearing nowhere in section 706 that it derived from the Supreme Court's 5-4 decision in *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007). (ROA.11755) These included "bad faith," "abuse of process," and risk of immediate reconversion due to futility. (ROA.11756-58, citing 549 U.S. at 372-74) But the court's reliance on these non-statutory reasons for denying conversion to Chapter 11 was reversible error.

### A. The Bankruptcy Court based its decision to deny conversion on non-statutory considerations of abuse of process, bad faith, and risk of futility derived from the Supreme Court's decision in *Marrama*.

*Marrama* was the first case to suggest that the "absolute"-seeming right of conversion in section 706 might be more "equivocal" than appears. 549 U.S. at 372. *Marrama* concerned a debtor's attempt to convert a case from Chapter 7 to Chapter 13—the chapter allowing individual debtors to reorganize. *Id*. at 368-69. In a 5-4 decision, the Supreme Court held that bankruptcy courts can refuse to convert a case

to Chapter 13 when the debtor has engaged in "prepetition bad-faith," even though the term "bad faith" does not appear in section 706. *Id*. at 367. The Court found support for that conclusion from two different sources.

First, the Court noted that section 706 requires that a debtor seeking to convert a case from Chapter 7 to another chapter must qualify as a "debtor" under that chapter. *Marrama*, 549 U.S. at 374 (citing 11 U.S.C. § 706(d)). The Court concluded that a debtor could not qualify as a "debtor" under Chapter 13 if the case would be immediately converted back to Chapter 7, on the theory that a bankruptcy court should not go through the futile task of converting a case to another chapter when it would be "immediately returned to Chapter 7." *Id*. at 368. And under section 1307(c), an originally-filed Chapter 13 case may be dismissed or converted to Chapter 7 "for cause," which the Court interpreted to include "fraudulent," "bad-faith" conduct—even though these terms are not among the enumerated causes listed in section 1307(c). *Id.* at 374-75. Accordingly, *Marrama* held that a Chapter 7 debtor who has committed "bad faith" "fraudulent" conduct and wishes to convert the case to Chapter 13 is not eligible to "be a debtor" under Chapter 13 because the case would be subject to immediate dismissal or reconversion to Chapter 7 under section 1307(c).

Second, *Marrama* held that bankruptcy courts also have power to deny a debtor's "automatic" statutory right to conversion based on 11 U.S.C. § 105, the

source of bankruptcy courts' general authority to issue injunctions or other orders as necessary to "prevent an abuse of process." 549 U.S. at 375. Section 105 bestows equitable powers and operates like a bankruptcy-specific version of the All Writs Act, 28 U.S.C. § 1651.

The Bankruptcy Court here built upon *Marrama* to create its three different non-statutory exceptions to the Debtor's "absolute" statutory right to conversion. Because *Marrama* held that bankruptcy courts can deny conversion to Chapter 13 when "cause" would exist for reconversion under section 1307(c)—which *Marrama* interpreted to include fraudulent bad faith—the Bankruptcy Court concluded that it could deny conversion to Chapter 11 for "bad faith"—or if any of the enumerated statutory grounds for reconversion exist under section 1112 (which governs Chapter 11 to 7 conversions). (ROA.11756-57) (citing 549 U.S. at 372-74) The court went on to conclude that because *Marrama* also permitted bankruptcy courts to deny conversion for bad faith based on section 105, they could deny conversion for any other "abuse of process" *besides* bad faith—simply because section 105 grants bankruptcy courts equitable powers to police "abuse of process" generally. (ROA.11757, 11761)

**B.      But *Marrama*'s non-statutory conditions are not applicable here.**

Yet there are several reasons why *Marrama*'s non-statutory conditions for conversion are inapplicable in this case.

### 1.　*Marrama*'s conditions are applicable only to conversions from Chapter 7 to 13—not conversions from Chapter 7 to 11.

For one thing, *Marrama* concerned a debtor's motion to convert a case from Chapter 7 to 13. The concerns that motivated *Marrama*'s holding are based on the unique statutory structure of Chapter 13 conversions for individuals—and do not translate to the very different structure of Chapter 11 conversions for businesses. That is because the risk of "immediate" reconversion is unique to Chapter 13. Section 1307(c) permits a party in interest or trustee to request conversion from an originally-filed Chapter 13 case to a Chapter 7 case for cause at any time. Accordingly, if a Chapter 7 debtor requests conversion to Chapter 13 and "cause" exists for reconversion under section 1307(c), the conversion would be doomed on day one and the case could land right back in Chapter 7. *Marrama* found it unnecessary to go through this unnecessary procedural formality and thus concluded that bankruptcy courts can permissibly deny conversion to Chapter 13 when a risk of "immediate" reconversion to Chapter 7 exists.

But that risk of immediate reconversion does not exist in the very different context of a conversion from Chapter 7 to 11. That is because under section 1112— the provision governing conversions from an originally-filed Chapter 11 to a Chapter 7—a case cannot be immediately converted. Even when "cause" might exist to convert the case to Chapter 7, section 1112(b) directs the court to first consider whether the problem can be alleviated by appointing a Chapter 11 trustee. *See* 11

U.S.C. § 1112(b)(1). And that is not all. Even if the court concludes that a trustee will not solve the problem, or the trustee's efforts have failed, the court still "may not convert a case" to Chapter 7 without also considering whether conversion is "not in the best interests of creditors and the estate," *id.* § 1112(b)(2)—in recognition that a piecemeal liquidation in Chapter 7 is normally worse for everyone. The existence of these intermediate steps makes it impossible for a case converted to Chapter 11 to be automatically and "immediately" reconverted back to Chapter 7. Thus, in the context of a Chapter 7 to 11 conversion, *Marrama*'s immediate-reconversion test is literally impossible to satisfy. And the concerns that led to the Court's holding simply do not exist in this context. Accordingly, *Marrama*'s non-statutory exceptions to a Chapter 7 to 13 conversion cannot be applied to a Chapter 7 to 11 conversion. Only the statutory factors in section 706 should govern.

In concluding otherwise, the Bankruptcy Court cited to a handful of decisions that have applied *Marrama* to Chapter 7 to 11 conversions—including decisions from several bankruptcy courts and the Eleventh Circuit. (ROA.11757, *citing, e.g., Daughtrey v. Rivera (In re Daughtrey)*, 896 F.3d 1255, 1276 (11th Cir. 2018)) But none of these courts accounted for the basic impossibility of lifting *Marrama*'s reasoning out of its specific statutory context of Chapter 13 conversions and applying it to the different context of Chapter 11 conversions. The only decision to even try was *Daughtrey*, and its reasoning is flawed.

29

*Daughtrey* found it easy to apply *Marrama* to a Chapter 7 to 11 conversion, concluding that *Marrama*'s holding had "even more force" in a Chapter 11 conversion because *Daughtrey* found the risk of reconversion to be purportedly *greater* in that context. 896 F.3d at 1275 n.50.  The court reasoned that conversions from Chapter 11 to 7 are mandatory while conversions from Chapter 13 to 7 are merely optional, based on the fact that "Chapter 11 mandates that 'the court *shall*' convert" a case to Chapter 7, "while Chapter 13 provides that a 'court *may*' convert" the case.  *Id.* (quoting 11 U.S.C. §§ 1123(b)(1), 1307(c)) (emphasis in original).  But that analysis is deeply flawed:  It simply fails to account for the intermediate steps in a conversion for cause from Chapter 11 to 7, which not only give bankruptcy courts options like appointing a trustee that would allow the court to forestall conversion, but also *prevent* a court from converting a case to Chapter 7 if it deems conversion to be worse for creditors and the estate.  Accordingly, there is no court, anywhere, that has adopted a persuasive reason for applying *Marrama*'s non-statutory grounds for denying conversion in the context of Chapter 11.  This Court should not adopt *Daughtrey*'s a-textual analysis.

### 2.    Some of *Marrama*'s non-statutory conditions do not survive the Supreme Court's later decision in *Law v. Siegel*.

The Bankruptcy Court also erred in relying on *Marrama* because certain parts of the decision are no longer good law. *Marrama* was a controversial case when it was decided, drawing a four-member textualist dissent that criticized the result as a

"strained reading of the Code." 549 U.S. at 379 (Alito, J., dissenting). It is doubtful that the current textualist-dominated Court would reach the same result today. But regardless, *Marrama*'s holding has been limited—if not reversed in part—by the Court's later decision in *Law v. Siegel*, 571 U.S. 415 (2014). In *Siegel*, a bankruptcy trustee obtained an order "surcharging" a debtor's homestead exemption as a sanction on the debtor for representing that the property was subject to liens that turned out to be fictitious. *Id*. at 419. The Court held that the surcharge was improper because the Code specified exactly the circumstances in which such surcharges were permitted, and a debtor's misbehavior was not among them. *Id.* at 421.

In so holding, the Court unanimously rejected *Marrama*'s dictum that bankruptcy courts possess broad equitable authority to deny rights provided to debtors under the Code based on their power to police "abuse of process" under section 105. The Court concluded that section 105 merely provides bankruptcy courts with authority to "'carry out' the provisions of the Code." 571 U.S. at 421 (quoting 11 U.S.C. § 105(a)). That provision reposits no "general, equitable power in bankruptcy courts" that would permit them to deny a debtor's statutory rights "based on [its] bad-faith conduct," and thus bankruptcy courts lack authority to exercise their equitable powers in a manner that would conflict with "specific," "explicit," and "express" language of the Code. *Id*. at 421-22, 425.

31

Following *Siegel*, several circuits have considered *Marrama*'s continuing vitality—and found it lacking. *See Nichols v. Marana Stockyard & Livestock Mt., Inc. (In re Nichols)*, 10 F.4th 956, 962 (9th Cir. 2021) (*Siegel* rejected *Marrama*'s "expansive" reading of "§ 105(a) [to] empower[] a bankruptcy court to disregard the express language" of the Code); *Smith v. U.S. Bank Nat'l Ass'n (In re Smith)*, 999 F.3d 452, 455-56 (6th Cir. 2021) (holding that *Siegel* "rejected" *Marrama*'s "dictum" about the existence of equitable exceptions to the Code); *Clabaugh v. Grant (In re Grant)*, 658 Fed. App'x 411, 414 (10th Cir. Sept. 20, 2016) (holding that *Siegel* "refined *Marrama*'s holding"). Yet even if *Marrama* does retain some vitality after *Siegel*, it can no longer support the broad equitable, non-statutory grounds that the Bankruptcy Court employed for denying conversion.

> **a.    *Siegel* holds that that a debtor cannot be denied rights provided under the Code as punishment for perceived "abuses" of the bankruptcy process.**

For one thing, *Siegel* undermines any notion that a debtor can be denied rights provided under the Code as punishment for perceived "abuse[s]" of the bankruptcy process under section 105. *Siegel* confirms that section 105 merely allows bankruptcy courts to "'carry out'" the provisions of the Code and does not allow courts to "'override explicit mandates of other sections of the Bankruptcy Code'" or "take[] action that the Code prohibits." 571 U.S. at 421 (quoting 11 U.S.C. § 105(a) and 2 COLLIER ON BANKRUPTCY ¶ 105.01[2], p. 105–6 (16th ed.

32

2013)). Accordingly, *Siegel* concluded that section 105 does not permit a bankruptcy court to "surcharge" a debtor's assets for perceived misdeeds—including outright dishonesty—because the Code specifies exactly the circumstances in which such surcharges are permitted, and punishing debtors for misconduct is not among them. Here too, the Debtor cannot be denied its right to convert based on the Bankruptcy Court's mere perception that the Debtor had "abused" the bankruptcy process because that is not among the reasons for denying conversion specified in section 706.

> **b.    *Siegel*'s reasoning fatally undermines any notion that a bankruptcy court can deny conversion based on amorphous notions of "bad faith."**

*Siegel*'s reasoning also fatally undermines any notion from *Marrama* that a bankruptcy court can deny conversion based on amorphous notions of "bad faith." *Siegel* knocked out that leg of *Marrama*'s reasoning, confirming that bankruptcy courts possess no generic authority under section 105 to deny debtors their statutory rights as a penalty for previous "bad faith."

And it is doubtful that *Marrama* can stand on its other leg regarding risk of reconversion. *Siegel* reiterated the importance of ensuring that bankruptcy courts exercise their "equitable powers" within the "confines" of the Bankruptcy Code and cannot use them to "contravene specific statutory provisions." 571 U.S. at 421. The Code sets forth the express conditions for conversion, and "bad faith" is not among

them. After all, as the *Marrama* dissenters correctly noted, the statutory requirement in 706(d) that a debtor may convert a case to another chapter "'if the debtor may be a debtor under such chapter' obviously refers to the chapter-specific requirements of § 109"—and does not refer to the "grounds for dismissal or reconversion" in other sections. *See* 549 U.S. at 380 (Alito, J., dissenting). That only makes sense: One who is in Chapter 11 is already a "debtor"—that is how it got into Chapter 11 in the first place. Accordingly, the only question that section 1112 answers is whether a Chapter 11 debtor should be deprived of the rights provided in Chapter 11, either by dismissing or converting the case to Chapter 7.

Furthermore, even under *Marrama*'s expansive reasoning—which allows bankruptcy courts to deny conversion to Chapter 11 to prevent futility when "cause" would exist to immediately reconvert the case back to Chapter 7—some legitimate "cause" for conversion to Chapter 7 must still exist under section 1112(b)(4) to give rise to a risk of reconversion. But "bad faith" is not among the enumerated grounds listed in section 1112(b)(4). And even though the definition of "cause" in section 1112(b)(4) is written in broad, incorporative language—stating that "'cause' *includes*" the enumerated grounds and therefore does not necessarily *exclude* other potential causes—it is nonetheless clear that the definition of "cause" is not so broad as to include "bad faith." Bad faith requires "dishonesty." *Bad faith*, BLACK'S LAW DICTIONARY (10th ed. 2024). But section 1112 contains no indication that Congress

34

intended to deny a debtor its right to proceed in Chapter 11 simply because it was dishonest at some point in the past. Rather, the enumerated causes in section 1112(b)(4) concern a debtor's failure to preserve estate assets (*see* § 1112(b)(4)(A),(B),(D)); to file required documents (*see* § 1112(b)(4)(F),(J)); to pay required fees (*see* § 1112(b)(4)(B)); to attend mandatory bankruptcy-related meetings (*see* § 1112(b)(4)(G),(H)); and to participate as necessary to ensure substantial consummation of a confirmed plan (*see* § 1112(b)(4)(K)-(O)).

Each of these enumerated causes deprives a debtor of Chapter 11's protections based on specific *actions*—not any "bad faith" motivations behind them. And they enumerate a clear quid pro quo necessary for a debtor to remain in Chapter 11: A debtor can remain in Chapter 11, and enjoy the advantages possessed by a Chapter 11 debtor, only so long as it continues to fulfill the *obligations* of a Chapter 11 debtor—because observance of those obligations is necessary to protect creditors. The causes do not include punishment for a debtor's past bad faith because Congress recognized that the consequences of refusing to allow conversion normally fall more heavily on creditors than debtors, thus requiring creditors to suffer for the debtors' misdeeds. Accordingly, *Marrama*'s expansive reasoning cannot stand on the "literal terms of the Code," 549 U.S. at 380 (Alito, J., dissenting), but necessarily depends upon its holding that bankruptcy courts can police "bad faith" under their equitable

35

powers provided by section 105. And once *Siegel* stripped that equitable power away, *Marrama*'s one remaining justification can no longer be sustained.

**3. *Marrama* does not apply here because the Trustee admitted that the Debtor satisfies the conditions to be a debtor in Chapter 11.**

Finally, to the extent *Marrama* still allows a bankruptcy court to deny conversion when cause would exist for reconversion and thus would prevent the debtor from qualifying as a "debtor" under Chapter 11, that reasoning cannot apply here. In responses to interrogatories, the Trustee did not contest that the Debtor does qualify as a debtor under Chapter 11.  (ROA.18969*)* That concession prohibits the Trustee from backtracking and claiming that the Debtor lacked the qualifications of a Chapter 11 debtor.

For all these reasons, *Marrama*'s non-statutory considerations for denying conversion from Chapter 7 to Chapter 11 should not apply in this case. Only the statutory requirements in section 706(a) and (d) must be satisfied. And because the Debtor indisputably met those requirements, the Bankruptcy Court erred as a matter of law in denying the Debtor's motion to convert to Chapter 11.

**IV. The Bankruptcy Court erred in concluding that its non-statutory conditions for denying conversion were present in this case.**

Yet even if the Bankruptcy Court could properly consider the non-statutory conditions it identified from *Marrama* in deciding whether to grant the Debtor's

motion to convert, the court was still legally required to convert the case because there is no evidence that any of these non-statutory conditions are present here.

## A. The Bankruptcy Court identified no evidence that the Debtor engaged in bad-faith conduct.

The Bankruptcy Court's refusal to grant the Debtor's motion to convert cannot be based on any evidence of "bad faith." After all, despite claiming to have identified a "smattering" of "evidence" that the Debtor had engaged in "bad faith" both "pre-petition and postpetition," the court did not identify a single specific example of postpetition bad faith, and disclaimed any intent to make findings of bad faith based on prepetition conduct. (ROA.11761) But the court still could not resist attacking the Debtor's former CEO, Toby Neugebauer—ruminating on the allegations that he had caused or contributed to the Debtor's downfall, reflecting on what these allegations said about his character, and deciding that it should take these unproven allegations into account in examining the "totality of the circumstances" to determine whether conversion was "in the best interest of creditors." (ROA.11761, 11766-68)

But the motivations and allegations that the Bankruptcy Court emphasized should have played no part in the inquiry whether to convert the case to Chapter 11. For one thing, the question whether a debtor is entitled to exercise its statutory right to convert a case to Chapter 11 should not turn on a "totality of the circumstances" inquiry that boils down to the "best interest of the creditors." To the extent that

37

inquiry involves anything more than applying section 706's statutory requirements, *Marrama* emphasizes that any non-statutory exceptions to the debtor's right to convert must remain exceedingly narrow and circumscribed, to ensure that the debtor's "absolute" right to conversion is disregarded only in the most "atypical" and "extraordinary" cases. 549 U.S. at 374, 375 & n.11. Anything else would allow considerations of equity to trump the strict requirements of the Code in exactly the way *Siegel* prohibits, and would transform bankruptcy courts into precisely the "roving commissions [doing] equity" that this Court has repeatedly prevented them from becoming. *Mirant Corp. v. Potomac Elec. Power Co. (In re Mirant Corp.),* 378 F.3d 511, 523 (5th Cir. 2004).

Furthermore, the term "bad faith" cannot be treated so malleably as to include the conduct and motivations relied upon by the Bankruptcy Court, which do not remotely resemble bad faith as *Marrama* envisioned it. "Bad faith" requires "dishonesty," *Bad faith*, BLACK'S LAW DICTIONARY (10th ed. 2024), or conduct that is "fraudulent." *Marrama*, 549 U.S. at 366. And *Marrama* makes clear that the only "bad faith" that could conceivably be grounds to deny conversion would entail conduct by the debtor that harms creditors—by "for example, fraudulently concealing significant assets." *Id*. at 367. The elements of dishonest conduct and harm to creditors runs through all the cases on which the Bankruptcy Court relied to support its analysis of bad faith. (*See* ROA.11756-61)

In *Marrama*, for example, "bad faith" existed because the debtor made "misleading or inaccurate" statements about his assets to keep them hidden "from his creditors." 549 U.S. at 368. While the Bankruptcy Court considered this case to bear "striking similarities" to *Daughtrey* (ROA.11768), the evidence of bad faith there was strikingly different, with the debtor repeatedly making "representat[ions]" to the court that turned out to be untrue or exaggerated, and consistently failing to comply with orders to update its schedules to reveal the identity of creditors, all in an effort to thwart a judgment creditor from satisfying its judgment. *See* 896 F.3d at 1259-73. Similarly, in *Kearney v. Unsecured Creditors Committee (In re Kearney)*, 625 B.R. 83, 98 n.107 (B.A.P. 10th Cir. 2021), the court emphasized that the debtor had exhibited "significant credibility issues" and "contempt for the courts and the judicial process," including "incessant" "lying under oath and otherwise." And in *Jacobsen v. Moser (In re Jacobsen)*, 609 F.3d 647, 649 (5th Cir. 2010)—a post-*Marrama*, pre-*Siegel* decision affirming the denial of a debtor's motion to dismiss his Chapter 13 case because of his bad faith—the Court determined that evidence of bad faith existed because the debtor had "interests in assets that were not disclosed on his schedules and that he had made transfers that were not disclosed in his Statement of Financial Affairs." *Id.* at 662.

The evidence on which the Bankruptcy Court relied did not remotely resemble the evidence of bad faith in these cases. The court pointed to Neugebauer's

supposedly "unyielding desire not to lose control" over the Debtor—as well as his alleged "impetuousness," "hubris," "manic communication style," and conspiratorial "mindset." (ROA.11766-67) But pride in the business one created and concern for one's investment are not remotely dishonest. Impetuousness, hypervigilance, and hubris do not constitute bad faith either. And an inquiry into the "psyche" of the Debtor's management is worlds away from the inquiry focused on harm to creditors from a debtor's fraudulent conduct that *Marrama* demands.

Similarly unavailing was the Bankruptcy Court's parroting of the allegations that Neugebauer's conduct supposedly contributed to the Debtor's demise. The court repeated accusations of Neugebauer's "mismanagement," "self-dealing," and "disregarding corporate formalities," culminating in an unflattering *Wall Street Journal* article that made it hard to raise the capital necessary to keep GloriFi operating. (ROA.11767-68) But those accusations were leveled without evidence, and some were entirely overblown. For instance, the court's accusation that Neugebauer "disregarded corporate formalities" did not involve undercapitalizing GloriFi or engaging in *ultra vires* actions, but instead involved little more than calling "last-minute board and investor meetings" and refusing to allow board members access to "company attorneys." (ROA.11767) At the same time, however, the court had to recognize that Neugebauer himself painted a different picture of

40

GloriFi's downfall that focused on the conduct of the outside investors—conduct that formed the basis of the DEGA Litigation. (ROA.11768 & n.11)

None of the conduct mentioned by the Bankruptcy Court remotely resembles "bad faith." And to allow the court's character attack on Neugebauer to stand as evidence of the Debtor's bad faith would debase the conversion inquiry into a personality contest rather than the inquiry that Congress requires. That inquiry must honor the debtor's statutory right to a Chapter 11 conversion—and the superior rights for creditors that flow from it—in all but the most "atypical" and "extraordinary" circumstances. Because the court strayed far from the required analysis, its order denying conversion cannot stand.

## B.    The Bankruptcy Court identified no evidence that the Debtor abused the bankruptcy process.

There are likewise a litany of reasons why the Bankruptcy Court could not deny conversion based on any "abuse of process" by the Debtor. Beyond the principle that denying conversion for "abuse of process" amounts to precisely the exercise of equitable power under section 105(a) that *Siegel* prohibits, "abuse of process" also falls well short of the "extraordinary" evidence of "fraudulent" "bad faith" that *Marrama* requires before conversion can be denied. Such a result also improperly denies *creditors* the protections of Chapter 11 based on purported misconduct by a *debtor*.

41

Yet even if bankruptcy courts could refuse to grant a debtor's motion to convert based on previous "abuses" of the bankruptcy process, no such abuse occurred here. The Bankruptcy Court found the Debtor's motion to convert abusive after concluding that it timed the motion to "exact a litigation advantage" by forestalling resolution of the Trustee's adversary proceeding. (ROA.11762) But that conclusion cannot be squared with the evidence—or with the Debtor's statutory right to file a motion to convert "at any time." In the adversary proceeding, the Trustee claimed that the DEGA Litigation was filed in violation of the automatic stay to "intentionally disrupt the Trustee's auction process." (ROA.11762) The DEGA Litigation, however, was not filed by the Debtor but by Neugebauer and the Collateral Agent—on behalf of the Debtor's secured creditors—so its filing cannot constitute an "abuse" of the bankruptcy process by the Debtor.

Moreover, the DEGA Litigation was not filed to "*cause* disarray into who" as between the estate and the secured creditors "owns certain causes of action" (ROA.11762), but to *avoid* such disarray. That is because the Trustee's proposed auction would have permitted the outright sale of all the causes of action against Neugebauer and the DEGA Defendants without determining whether those causes of action were owned by the estate or belonged to the secured creditors—who had foreclosed upon certain assets prepetition and had security interests in others. The adversary proceeding would have brought the conflict to a head so that the

42

Bankruptcy Court could determine who owned which of the causes of action. And until the JIG agreement came along, the Trustee was willing to *resolve* the adversary proceeding in a settlement with Neugebauer and the Collateral Agent that allowed the estate to own and assert most of the causes of action (ROA.15002)—a resolution that was not far off from the ultimate outcome of the adversary proceeding. *See Seidel v. Neugebauer, et al.*, No. 24-03038-MVL (Bankr. N.D. Tex.) (Dkt. no. 563 at pp. 95-96).

Furthermore, while the Bankruptcy Court emphasized that the proposed plan accompanying the Debtor's motion to convert would have prevented the adversary proceeding from going forward (ROA.11762), that is because the adversary proceeding would no longer be necessary. There would be no need to parse out precisely who had interests in which causes of action when the plan provided that the Debtor's chief restructuring officer would have the right to assert them all— except the claims against Neugebauer that would be sold separately. (ROA.26112-13) Planning for that eventuality was prudent and cannot legitimately be called "abusive."

The Bankruptcy Court next seemed to have found "abuse" in the manner in which the Debtor served its motion to convert, concerned that the Debtor's service on only those registered to receive ECF notices might omit "creditors who filed proofs of claim but did not appear by counsel in the bankruptcy case." (ROA.11763)

43

The court offered no reason to suggest the Debtor sought "to exact any litigation advantage" through this simple oversight. And although the Debtor immediately rectified any notice problem by sending each of the creditors a copy of the motion "via Federal Express Priority Overnight and/or Express Mail delivery" (ROA.11763 n.4), the court declined to postpone the hearing to ensure that any objections from these later-served creditors could be heard (ROA.11763). The court also restricted the Debtor from introducing evidence of the "significant support" that the Debtor's plan enjoyed from unsecured creditors—despite expressing a willingness to consider any potential objections "on negative notice" to allow the later-served creditors an opportunity to be heard should the motion to convert be granted. (ROA.11763 & n.5) Once again, this action improperly punished the many creditors who had pledged to support conversion for an apparent mistake by the Debtor.

In any event, the Bankruptcy Court went on to consider the support enjoyed by the Debtor's motion to convert anyway, and while the court found reasons to dismiss that support, its rationale falls short. The court noted that many of the signatories to the Restructuring Support Agreement were "insiders" or "former insiders" who would "benefit from conversion of the Series 1 notes to equity." (ROA.11764-65) The court concluded that the proposed Chapter 11 plan lacked sufficient support from "unsecured creditors"—even though eleven unsecured

creditors (four of whom had filed proofs of claims) signed onto the RSA directly, while none objected.  (ROA.11765)

The Bankruptcy Court also raised concerns that some of those who signed the RSA may not have known what the proposed plan actually entailed (ROA.11764), although the court did not identify anyone who was actually misinformed. The court questioned why one equity holder, Caroline Lillard, would support conversion when "there is no estimation of a recovery for equity." (ROA.11764) But with approximately $55 million in debt and potentially hundreds of millions of dollars in potential litigation recoveries, it was reasonably foreseeable that equity holders would get some recovery. In any event, Ms. Lillard testified that she was not motivated by self interest; instead, she supported conversion because she "trust[s] Toby" and "believe[d] that what he's trying to do is in the best interest of" everyone, including "former employees and shareholders." (ROA.24826)

The court expressed additional concern that Michael Blankenship, the principal of a law firm creditor, described the Debtor's plan as a "restructur[ing]" when there was no likelihood that GloriFi would continue as a going concern. (ROA.11764) It is common, however, to refer to the Chapter 11 process as a "restructuring" regardless of what the debtor's plan ultimately entails.  And the court acknowledged that Blankenship's support was not based on any illusion that GloriFi would be resurrected but instead was based on an accurate "belief that Chapter 11 is

45

more favorable than Chapter 7." (*Id.*) Nothing suggests that the many creditors supporting the Debtor's plan had been "abused" or misled.

And ultimately, this myopic focus on support for the Debtor's plan was misplaced. Nothing in section 706 imposes any threshold of creditor support that must exist before conversion can be allowed because the Code presumes that creditors are generally better served in Chapter 11 and therefore demands liquidation in Chapter 7 only when achieving a Chapter 11 plan proves impossible. Indeed, the Bankruptcy Court's effort to dissect creditor support for the proposed plan only highlights the flaws in its decision to deny conversion: It permanently deprived the creditors of a voice in deciding how estate assets should be distributed, it denied them a chance to vote on a Chapter 11 plan, and it instead imposed a distribution scheme by private agreement and judicial fiat.

Finally, the Bankruptcy Court missed the mark in characterizing the Debtor's motion to convert as abusive merely because its "only purpose is to liquidate rather than reorganize." (ROA.11766) (citing *In re NLG, LLC*, No. 21-11269, 2023 WL 2053920, at *10 (Bankr. D. Del. Feb. 16, 2023); *Dan Thomason & Assocs., LLC v. Breakwell*, No. 3-10-CV-00379-K, 2010 WL 3385025, *2 (N.D. Tex. Aug. 25, 2010)) Cases frequently proceed through Chapter 11 even when the end result is a liquidation: As the Supreme Court has emphasized, Chapter 11's provisions "reflect an understandable expectation that Chapter 11 would be used *primarily* by debtors

with ongoing businesses" but "they do not constitute an additional prerequisite for Chapter 11 eligibility beyond those established in § 109(d)"—including any requirement that the debtor must emerge as a going concern. *Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (emphasis in original).

Indeed, the Trustee conceded that it is "[n]ot out of the ordinary" for a Chapter 11 to involve liquidation of causes of action, and he personally has served as a plan trustee over a liquidating trust pursuing causes of action. (ROA.26696) And nothing in section 706 or the case law requires that a debtor provide a plan to reorganize as a going concern as a prerequisite for converting to Chapter 11—because Congress recognized that Chapter 11 confers advantages over Chapter 7 for debtors and creditors alike even when the end result may be a liquidation. The only question relevant to conversion is whether Chapter 11 would provide *some* positive benefit above and beyond Chapter 7—and the ability to vote on a plan rather than have it effectuated by *sub rosa* fiat as a Chapter 7 "settlement" is manifestly better. For this additional reason, conversion to Chapter 11 should have been granted.

> ### C. The Bankruptcy Court identified no risk of "immediate" reconversion suggesting that conversion would be futile.

Finally, the Bankruptcy Court could not deny conversion based on a risk of "immediate" reconversion from Chapter 11 to Chapter 7. The court's analysis of this issue began on the wrong foot by failing to consider the steps necessary to translate *Marrama*'s immediate-reconversion holding into the different context of

Chapter 11. If *Marrama*'s holding has any application in the Chapter 11 context, then a bankruptcy court considering whether to deny conversion to Chapter 11 based on the risk of reconversion to Chapter 7 must at least consider all the steps that would have to be completed under section 1112 before conversion of a Chapter 11 case could occur. The Bankruptcy Court ignored most of those steps, considering only whether "cause" for conversion might exist while overlooking the intermediate steps that bankruptcy courts must undertake under section 1112 *after* identifying such cause. These include determining whether to appoint a Chapter 11 trustee under section 1112(b)(1) and analyzing whether converting the case to Chapter 7 would not serve the best interests of creditors and the estate under section 1112(b)(2). Unless these intermediate steps are unworkable or inapplicable, then the Bankruptcy Court would have been compelled to conclude that immediate reconversion is not a possibility.

Yet there is every reason to believe that if this case had been converted to Chapter 11, the Bankruptcy Court would have had to explore *both* steps before reconversion to Chapter 7 could occur. As the Bankruptcy Court acknowledged, the U.S. Trustee indicated that she would request appointment of a Chapter 11 trustee if the case were converted to Chapter 11, and the court indicated that it would grant that request—going so far as to worry about the duplicative work that would occur

48

as the Chapter 11 trustee got up to speed. (ROA.11769, 26985) That alone demonstrates that immediate reconversion would be impossible.

The second intermediate step also would have prevented immediate reconversion in this case. If the Bankruptcy Court had considered whether to keep the case in Chapter 11 despite the existence of cause to convert, it would have been hard-pressed to deny that conversion would "not [be] in the best interests of creditors and the estate." 11 U.S.C. §1112(b)(2). After all, keeping the case in Chapter 11 would have allowed creditors to either vote on a plan or propose their own rather than have the JIG agreement imposed by judicial fiat. And that too would have prevented reconversion. The court's failure to consider these intermediate steps is therefore reason alone to reverse its order denying the motion to convert.

The Bankruptcy Court's analysis of the risk of reconversion was also incorrect in addition to being incomplete. The court concluded that cause for reconversion existed under section 1112(b)(4)(A), which provides that "cause" to convert a case to Chapter 7 exists when there is "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." (ROA.11757, 11773) But the court identified no evidence to support cause to convert under that section. The court worried that appointment of a Chapter 11 trustee would create an "incredibly burdensome expense for the estate"

49

when the trustee's work "would be largely duplicative" of work the Chapter 7 trustee had already undertaken. (ROA.11769) The existence of "loss" to the estate, however, is only one part of the equation under section 1112(b)(4)(A). The court must also determine whether there would be a "reasonable likelihood of rehabilitation"—despite any increase in expenses—as a result of recouping those expenses from some other source. Here, there is little doubt—and certainly a "reasonable likelihood"—that the litigation recoveries anticipated under the Debtor's proposed plan would make any expenses of a Chapter 11 trustee trivial in comparison. So cause for immediate reconversion under section 1112(b)(4)(A) would not exist.

The Bankruptcy Court also concluded that immediate cause for reconversion would exist under section 1112(b)(4)(M), which allows for conversion to Chapter 7 because of the debtor's "inability to effectuate substantial consummation of a confirmed plan." (ROA.11757, 11773) But here too the court's analysis was flawed. Because *Marrama* requires that cause for reconversion must exist "immediately" upon conversion of a case, every court to have denied conversion out of concern for a risk of reconversion under section 11 U.S.C. § 1112(b)(4)(M) did so only when conditions existing as of the date of conversion made confirmation of a plan literally impossible.

For example, in *In re Daughtrey*, the court concluded that section 1112(b)(4)(M) justified denial of the debtors' motion to convert to Chapter 11 because the debtors had proven "financially incapable of prosecuting a plan to confirmation and eventual consummation" when their proposed plan depended on a sale of property to satisfy a judgment creditor—even though the debtors had "no cash on hand" and identified no investor willing to pay enough to satisfy the judgment and associated capital gains taxes. 896 F.3d at 1278-79; *see also In re NLG, LLC*, 2023 WL 2053920 at *7-10 (holding that risk of reconversion under section 11 U.S.C. § 1112(b)(4)(M) existed when the only potential assets of the estate sprang from potential litigation but there were no "resources to fund a Chapter 11 bankruptcy process, let alone pursue litigation" and the debtor had no money to pay those expenses itself).

Yet the Bankruptcy Court here did not identify a single impediment that existed as of the date of conversion that would make substantial consummation of a confirmed plan impossible. Instead, the court merely posited a series of speculative hypotheticals about risks that *might* imperil consummation of a confirmed plan. And it based those hypotheticals on circumstances that had not yet occurred on the date the conversion motion was decided.

Initially, the Bankruptcy Court expressed concern about the existence of "conflicts of interests" that could derail consummation of the proposed plan, noting

51

that Neugebauer's interests might diverge from those of other interested parties given that Neugebauer stood "the most to gain" from the plan as "CEO of the Debtor, the largest equity holder, a potential litigation target, and the largest holder of Series 2 notes." (ROA.11769) The court also observed that Neugebauer was largely in the driver's seat in formulating the Chapter 11 conversion, as he had come up with "the idea of converting the case to Chapter 11," was "heavily involved in the preparation of the documents for conversion," and served as the "primary mouthpiece" to drum up support. (ROA.11770) But the fact that Neugebauer had "the most to gain" from conversion does not negate the many benefits that others would gain from a Chapter 11 proceeding. And the Bankruptcy Court identified no reason to conclude that Neugebauer's gains would come at others' expense. Indeed, it is precisely because Neugebauer is a secured creditor, an unsecured creditor, and a shareholder that he had incentives to maximize recovery for all these constituencies in the Chapter 11 process. (ROA.11770) For all these reasons, it would be sheer speculation to suggest that conflicts of interest could ever derail the confirmation process—far from the "immediate" cause for reconversion that *Marrama* and section 706 demand.

In any event, the Debtor had a plan to manage these conflicts of interest—by requiring Neugebauer to step down as CEO and have highly respected former Bankruptcy Judge Leif Clark serve as Chief Restructuring Officer of the debtor-in-possession during the Chapter 11 process. (ROA.21981, 26460) And the Bankruptcy

Court's reasons for discounting Judge Clark's ability to mitigate any potential conflicts are unavailing. Although the court raised concern that Neugebauer had a "long history of leaving and returning to management and removing board members and decision makers with whom he disagrees from power" (ROA.11771), the mere *possibility* that Neugebauer might *one day* return to management is hardly a circumstance suggesting a risk of "*immediate*" reconversion. Neugebauer also had no unilateral right to return to a management position after handing over the reins to Judge Clark. At the very least, any such action would require bankruptcy-court approval.

Equally unavailing is the Bankruptcy Court's concern that Judge Clark had not developed a full understanding of "the Debtor, its history, the Collateral Agent, and Mr. Neugebauer" by the time of the hearing on the motion to convert. (ROA.11771) The court recognized that Clark had been engaged to serve as chief restructuring officer just "20 days" before the hearing began—and thus lacked a full opportunity to "learn the complicated procedural and factual history of this case." (*Id*. at n.12) But Clark's relative unfamiliarity with the case after that short time is not cause to deny conversion. The question again is whether cause would exist for immediate reconversion. And whatever details Clark did not know at the moment of conversion were surely ones he would learn as the Chapter 11 progressed. His

lack of initial familiarity therefore does not negate any potential for consummation of a confirmed Chapter 11 plan—or create immediate cause for reconversion.

Finally, there was no merit to the Bankruptcy Court's concern that the Debtor would not be able to consummate a confirmed plan because funding would be unavailable to support the Chapter 11 plan or the litigation it contemplated. (ROA.11771-74) Again, those concerns were impermissibly speculative, requiring the court to completely discount the $2 million interest-free DIP facility that the Collateral Agent promised as well as the contemplated $4 million from selling the causes of action against Neugebauer—both of which could be used to pay administrative and other expenses. (ROA.16288-90, 26109-10, 26157-58, 26184) And much of the litigation expense would be funded by the Collateral Agent and Neugebauer, with third-party litigation financing for the remainder. (ROA.26111, 26165)

The Bankruptcy Court's concern about funding impermissibly rested on speculation that any or all of these revenue sources would fall through after conversion was granted. The court worried that the Collateral Agent would be unable to raise the $2 million DIP financing—despite recognizing that it had already successfully raised part of the money by the time of the hearing. (ROA.11771-72) The court similarly speculated that no one might be willing to pay $4 million for the claims against Neugebauer (ROA.11773)—ignoring the fact that JIG was willing to

pay $6 million to gain control over estate claims that centered on those against Neugebauer (ROA.26158). And the court hypothesized that the Collateral Agent's funding might be jeopardized if its liens were invalidated (ROA.11772)—even though the court later upheld a substantial portion of those liens in its decision resolving the adversary proceeding. *See Seidel v. Neugebauer, et al.*, No. 24-03038-MVL (Bankr. N.D. Tex.) (Dkt. No. 563 at pp. 95-96).

In short, the Bankruptcy Court cited nothing but speculation to support its conclusion that "cause" would exist under sections 11 U.S.C. § 1112(b)(4)(A) or 11 U.S.C. § 1112(b)(4)(M) to immediately reconvert a Chapter 11 case back to Chapter 7 if the Debtor's motion to convert were granted. In contrast to the ill-prepared and inadequately funded debtors in the cases on which the court relied, the Debtor here proposed a plan that was realistic and supported by key estate constituents, entitling it to proceed toward confirmation and consummation. By refusing to give the Debtor even a chance in Chapter 11, the Bankruptcy Court thwarted the broad and near-absolute right to conversion set forth in 11 U.S.C. § 706(a).

## CONCLUSION

For the reasons stated above, the Court should reverse the Bankruptcy Court's Order Denying Motion to Convert Case to Chapter 11, render judgment granting the conversion motion, and remand the case for further proceedings. Additionally (or alternatively), the Court should grant the relief requested in the Collateral Agent's

appellate brief relating to the Bankruptcy Court's order approving the agreement between the Chapter 7 Trustee and JIG.

Respectfully submitted,

/s/ Jeffrey S. Levinger
**Jeffrey S. Levinger**
State Bar No. 122588300
jlevinger@levingerpc.com
**J. Carl Cecere (of Counsel)**
State Bar No. 24050397
ccecere@cecerepc.com
**Levinger PC**
1700 Pacific Ave., Suite 2390
Dallas, TX 75201
Telephone: 214-855-6817
Facsimile: 214-817-4590

*Counsel for With Purpose, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 21, 2025, this Brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the Appellate CM-ECF System. Participants in this case who are registered CM-ECF users will be served electronically by the Appellate CM-ECF System.

/s/ Jeffrey S. Levinger
**Jeffrey S. Levinger**

**CERTIFICATE REGARDING PRIVACY REDACTIONS AND VIRUS SCANNING**

The undersigned certifies that: (1) all required privacy redactions have been made in this brief, in compliance with 5TH CIR. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, in compliance with 5TH CIR. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1.  This brief complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by FED. R. APP. P. 32(f):

    ☒    it contains 12,984 words.

2.  This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

    ☒    it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 pt. Times New Roman (and 13 pt. for footnotes).

*/s/ Jeffrey S. Levinger*

**Jeffrey S. Levinger**

*Counsel of Record for
With Purpose, Inc.*

November 21, 2025