**No. 25-10573**

---

**In the
UNITED STATES COURT OF APPEALS
for the Fifth Circuit**

---

**In the Matter of With Purpose, Incorporated,**
*Debtor.*

---

**With Purpose, Incorporated; WPI Collateral Management, L.L.C.,**
*Appellants,*

***v.***

**Scott M. Seidel, Trustee; GloriFi Acquisitions, L.L.C.; Jackson
Investment Group, L.L.C.,**
*Appellees.*

---

**On Appeal from the United States Bankruptcy Court
for the Northern District of Texas, Dallas Division**
*Honorable Michelle V. Larson, Bankruptcy Judge*
Case No. 23-30246-MVL-7

---

**BRIEF OF APPELLANT WPI COLLATERAL MANAGEMENT, L.L.C.**

---

**Ryan Downton**
State Bar No. 24036500
Ryan@TheTexasTrialGroup.com
**The Texas Trial Group, PC**
875 Carr 693, Ste. 103
Dorado, Puerto Rico 00646
Telephone: 512-680-7947

*Counsel for WPI Collateral Management,
L.L.C.*

**CERTIFICATE OF INTERESTED PERSONS**

No. 25-10573; *With Purpose, Incorporated, et al. v. Scott M. Seidel, et al.*

The undersigned counsel of record certifies that the following listed persons and entities covered under 5TH CIR. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.      **Appellants:**

With Purpose, Incorporated
WPI Collateral Management, L.L.C.

2.      **Counsel for Appellants:**

Jeffrey S. Levinger
J. Carl Cecere (of Counsel)
Levinger PC
1700 Pacific Ave., Suite 2390
Dallas, TX 75201
*(Counsel for WPI)*

Ryan Downton
The Texas Trial Group, PC
875 Carr 693, Ste. 103
Dorado, PR 00646
*(Counsel for WPI Collateral Mgt.)*

3.      **Appellees:**

Scott M. Seidel, Trustee
GloriFi Acquisitions, L.L.C.
Jackson Investment Group, L.L.C.

4.      **Counsel for Appellees:**

Davor Rukavina
Thomas D. Berghman
Munch Hardt Kopf & Harr, P.C.
500 N. Akard Street, Suite 3800
Dallas, Texas 75201
*(Counsel for Seidel)*

i

Paul M. Rosenblatt
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
*(Counsel for GloriFi Acquisitions
and J.I.G.)*

*/s/ Ryan Downton*

**Ryan Downton**

*Counsel for WPI Collateral
Management, L.L.C.*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to 5TH CIR. R. 28.2.3, Appellant WPI Collateral Management, LLC (the "Collateral Agent") requests oral argument. This appeal involves two separate but related bankruptcy-court orders—one approving a private agreement between the Chapter 7 trustee and a party claiming to be an unsecured creditor (which is addressed in this brief), and a second denying the motion of the Debtor With Purpose, Inc. ("Debtor" or "WPI") to convert the case from a Chapter 7 to a Chapter 11 (which is addressed in the brief filed by the Debtor). These briefs raise an assortment of bankruptcy-law issues that are novel, important, and complex. And the record on appeal is voluminous, consisting of over 30,000 pages of pleadings, hearing transcripts, exhibits, and court orders. In light of the issues and the voluminous record, the Collateral Agent believes that oral argument will assist the Court in evaluating the record and resolving the legal issues in this case.

## TABLE OF CONTENTS

Certificate of Interested Persons ...................................................................................i

Statement Regarding Oral Argument ........................................................................ iii

Table of Contents ........................................................................................................iv

Table of Authorities ...................................................................................................vi

Jurisdictional Statement ...............................................................................................1

Statement of the Issues.................................................................................................2

Introduction ..................................................................................................................3

Statement of the Case...................................................................................................5

I.      Factual History.................................................................................................5

II.     Procedural History ...........................................................................................7

Summary of the Argument..........................................................................................17

Argument.....................................................................................................................20

I.      Standard of Review........................................................................................20

II.     The Trustee lacked statutory authority to enter into the JIG
        Agreement.......................................................................................................21

        A.     The JIG Agreement did not constitute a sale of estate claims in
               compliance with section 363. .........................................................22

               1.     The JIG Agreement did not actually sell any estate
                      claims. .................................................................................22

               2.     The JIG Agreement could not have sold any estate claims
                      without violating the Code...................................................26

        B.     The JIG Agreement was not a compromise of litigation that could
               be approved under Rule 9019...........................................................29

        C.     The JIG Agreement is a *sub rosa* plan. ...........................................32

III.    The Bankruptcy Court erred in approving the JIG Agreement. .....................34

    A.    The JIG Agreement impermissibly assigned control of the estate's claims to a target of those claims, thus violating the Trustee's fiduciary duty to the estate. ................................................35

    B.    The JIG Agreement impermissibly created a *de facto* release of one non-debtor's claims against another. ..............................................38

    C.    The JIG Agreement impermissibly allowed JIG's claim in full without adjudicating the Collateral Agent's objections to that claim. ......................................................................................................39

    D.    The Bankruptcy Court erred in concluding that the JIG Agreement was in the best interests of the estate.................................42

        1.    By focusing on Rule 9019's factors for litigation compromises, the court applied inappropriate factors and reached largely irrelevant conclusions.....................................42

        2.    The Bankruptcy Court failed even to consider the Collateral Agent's superior competing offer. ...........................46

        3.    The JIG's Agreement's essential terms were inferior to both the Trustee's previous settlement and the Collateral Agent's final proposal. ..............................................48

IV.    At a minimum, the Bankruptcy Court should have conferred derivative standing on the Collateral Agent to prosecute claims that JIG and the Trustee were unwilling to assert. ...................................................................51

Conclusion ..........................................................................................................55

Certificate of Service ..........................................................................................56

Certificate Regarding Privacy Redactions And Virus Scanning ...........................57

Certificate of Compliance With Type-Volume Limit .............................................57

v

## TABLE OF AUTHORITIES

**Cases**

*Am. Bankers Life Assurance Co. of Fl. v. Overton*,
128 F. App'x 399 (5th Cir. Apr. 21, 2005) ........................................................42

*Baker Hughes Oilfield Operations, Inc. v. Morton*
(*In re R.L. Adkins Corp.*),
784 F.3d 978 (5th Cir. 2015) ...........................................................................27

*Bank of New York Trust Co. v. Official Unsecured Creditors' Committee*
(*In re Pacific Lumber Co.*),
584 F.3d 229 (5th Cir. 2009) ...........................................................................26

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster*
*Mortgage Co.*),
68 F.3d 914 (5th Cir. 1995).................................................................... 30, 44

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017) ................................................... 32, 33, 34, 35

*Harrington v. Purdue Pharma, L.P.*,
144 S. Ct. 2071 (2024) ............................................................... 38, 39

*Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc.* (*In re Trailer*
*Source, Inc.*),
555 F.3d 231 (6th Cir. 2009).................................................... 53, 54

*In re Douglas J. Roger, M.D., Inc., APC*,
393 F. Supp. 3d 940 (C.D. Cal. 2019)...............................................................46

*In re Abraham,*
163 B.R. 772 (Bankr. W.D. Tex. 1994)........................................... 23, 36

*In re Guyana Dev. Corp.*,
201 B.R. 462 (Bankr. S.D. Tex. 1996)...............................................................23

*Century Indem. Co. v. Nat'l Gypsum Settlement Trust*
(*In re National Gypsum Co.*),
208 F.3d 498 (5th Cir. 2010).............................................................................21

*In re Roqumore*,
  393 B.R. 474 (Bankr. S.D. Tex. 2008)........................................................30

*In re Volkswagen of Am., Inc.*,
  545 F.3d 304 (5th Cir. 2008) (en banc)......................................................21

*Institutional Creditors of Continental Air Lines, Inc. v. Continental Air
  Lines, Inc.*(*In re Cont'l Air Lines, Inc.*),
  780 F.2d 1223 (5th Cir. 1986 ....................................... 26, 32, 33, 34, 45

*Jacobsen v. Moser (In re Jacobsen)*,
  609 F.3d 647 (5th Cir. 2010).....................................................................21

*Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*,
  552 F.2d 601 (5th Cir. 1977)......................................................................42

*Kowal v. Malkemus (In re Thompson)*,
  965 F.2d 1136 (1st Cir. 1992) ...................................................................35

*Louisiana World Exposition, Inc. v. Fed. Ins. Co.* (*In re Louisiana World
  Exposition, Inc.*),
  858 F.2d 233 (5th Cir. 1988)............................................................... 51, 52

*Marrama v. Citizens Bank of Mass.*,
  549 U.S. 365 (2007) ...................................................................................22

*NCNB Texas Nat'l Bank v. Cowden*,
  895 F.2d 1488 (5th Cir. 1990)....................................................................24

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop.*
  (*In re Cajun Elec. Power Coop.*),
  119 F.3d 349 (5th Cir. 1997)........................................................ 15, 21, 29, 32

*Official Committee of Unsecured Creditors v. Moeller*
  (*In re AGE Refining Corp.*),
  801 F.3d 530 (5th Cir. 2015)............................................................... 40, 41

*Pension Benefit Guaranty Corp. v. Braniff Airways, Inc.*,
  (*In re Braniff Airways, Inc.*),
  700 F.2d 935 (5th Cir. 1983)............................................................ 20, 32, 33, 34

*PricewaterhouseCoopers, LLP v. Giddens (In re MF Global Inc.)*,
  496 B.R. 315 (S.D.N.Y. 2013)....................................................................25

*PW Enterprises, Inc. v. North Dakota Racing Commission, Inc.* (*In re Racing Services, Inc.*),
  540 F.3d 892 (8th Cir. 2008) ................................................................ 52, 53, 54

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) .............................................................................. 27, 28

*Reed v. Cooper (In re Cooper)*,
  405 B.R. 801 (Bankr. N.D. Tex. 2009) ................................................. 17, 23

*Rivercity v. Herpel (In re Jackson Brewing Co.)*,
  624 F.2d 599 (5 th Cir. 1980) ....................................................................25

*S'western Bell Tel. Co. v. Long Shot Drilling, Inc.*
  *(In re Long Shot Drilling, Inc.)*,
  224 B.R. 473 (10th Cir. B.A.P. 1998).......................................................25

*Transamerican Leasing Co. v. Three Bears, Inc.*,
  586 S.W.2d 472 (Tex. 1979) ............................................................... 23, 36

*United States v. Carlo*,
  507 F.3d 799 (2d Cir. 2007)......................................................................23

*Valucci v. Glickman, Berkovitz, Levinson & Weiner (In re Glickman, Berkovitz, Levinson & Weiner)*,
  204 B.R. 450 (E.D. Pa. 1997)....................................................................46

*Weingartner v. Chase Home Fin., LLC*,
  702 F. Supp. 2d 1276 (D. Nev. 2010) .......................................................36

**Statutes**

11 U.S.C. § 362(c) .......................................................................................26

11 U.S.C. § 362(d) .......................................................................................26

11 U.S.C. § 362(e) .......................................................................................26

11 U.S.C. § 362(f) ........................................................................................26

11 U.S.C. § 363 ...................................................................................... passim

11 U.S.C. § 363(b) .......................................................................................22

11 U.S.C. § 363(c) ...............................................................................26

11 U.S.C. § 363(d) ...............................................................................26

11 U.S.C. § 363(d)(2)............................................................................27

11 U.S.C. § 363(e) ...............................................................................28

11 U.S.C. § 363(f) ................................................................................27

11 U.S.C. § 363(m) .......................................................................... 16, 25

11 U.S.C. § 502(b) ........................................................................ 40, 41, 42

11 U.S.C. § 502(b)(1)............................................................................41

11 U.S.C. § 704(a)(1).............................................................................21

11 U.S.C. § 706(a) ...............................................................................13

11 U.S.C. § 1125 .................................................................................33

11 U.S.C. § 1126 .................................................................................33

28 U.S.C. § 157(b)(2)(A) .........................................................................1

28 U.S.C. § 157(b)(2)(B) .........................................................................1

28 U.S.C. § 157(b)(2)(O) .........................................................................1

28 U.S.C. § 158(a) ..................................................................................1

28 U.S.C. § 158(d) ..................................................................................1

28 U.S.C. § 158(d)(2)(A) .........................................................................1

28 U.S.C. § 1334 ................................................................................1, 29

**Rules**

FED. R. BANKR. P. 6004 ........................................................................22

FED. R. BANKR. P. 9019 ................................................................. passim

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2024) ........................................................30

BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 543 (2025 ed.)...........................37

RESTATEMENT (SECOND) OF AGENCY § 18 (1958)....................................................24

RESTATEMENT OF TRUSTS § 170(1) (1935) ............................................................35

RESTATEMENT OF TRUSTS § 171 & cmt. b., illus. 1 (1935).....................................36

**JURISDICTIONAL STATEMENT**

1.      This appeal arises from the Bankruptcy Court's Order Granting Trustee's Motion for Approval of Compromise and Settlement with, and Sale to, Jackson Investment Group LLC (ROA.11806 [RE4]) and Order Denying Motion to Convert Case to Chapter 11 (ROA.11805 [RE3], both entered on January 24, 2025, and from the Bankruptcy Court's Memorandum Opinion on those motions entered on January 22, 2025 (ROA.11737[RE5]). The Bankruptcy Court had jurisdiction over the Chapter 7 case under 28 U.S.C. §§ 157(a)-(b) and 1334, and the motions at issue constitute core proceedings under 28 U.S.C. §§ 157(b)(2)(A), (B), and (O). (ROA.11738)

2.      Appellants WPI Collateral Management, LLC (the "Collateral Agent") and With Purpose, Inc. ("WPI" or the "Debtor") timely filed an amended notice of appeal on February 5, 2025. (ROA.2335 [RE2]) Pursuant to 28 U.S.C. § 158(d)(2)(A), Appellants moved this Court for leave to allow a direct appeal, which this Court granted in an unpublished order on May 1, 2025. This Court has jurisdiction over the appeal under 28 U.S.C. § 158(d)(2)(A).

1

**STATEMENT OF THE ISSUES**

I.  Did the Bankruptcy Court improperly grant the Trustee's motion to approve the JIG Agreement when:

    A.  the Trustee lacked legal authority to enter into, and the Bankruptcy Court lacked legal authority to approve, the JIG Agreement, which is neither a "sale" of claims under section 363 nor a "settlement" under Rule 9019, but is instead an illegal *sub rosa* plan of liquidation; and

    B.  the JIG Agreement violated the rights of creditors under the Code by:

        1.  assigning control over estate claims to a target of those claims, creating impermissible conflicts of interest in violation of the Trustee's fiduciary duties;

        2.  imposing an improper *de facto* non-consensual release of claims by non-debtors against non-debtors;

        3.  requiring that JIG's proof of claim be allowed in full without hearing the Collateral Agent's timely objection; and

        4.  approving the JIG Agreement when it was not in the best interests of the estate?

II.  At a minimum, should the Bankruptcy Court have conferred derivative standing on the Collateral Agent to pursue claims that JIG and the Trustee are unwilling to pursue?[1]

---

[1] In addition to these issues, the Collateral Agent joins the Statement of Issues contained in the Debtor's appellate brief and adopts the Debtor's arguments in full.

**INTRODUCTION**

This case concerns the Chapter 7 bankruptcy of With Purpose, Inc., a company founded to provide banking and financial services to consumers with conservative values. The main issue in the bankruptcy—and the "battle for the soul of the case" as the Bankruptcy Court described it (ROA.16201)—concerned control over the Debtor's largest asset: its causes of action against the various directors, officers, and investors who allegedly caused or contributed to its demise. These claims were conservatively estimated to be worth more than $1 billion.

The Chapter 7 Trustee originally agreed to have all these causes of action prosecuted against all the potential defendants—thereby maximizing the potential recovery for the estate. But then one of the litigation targets, Jackson Investment Group ("JIG"), devised a plan to obtain control over the causes of action so it could effectively release the claims against itself and its allies. The Trustee agreed to this plan and the Bankruptcy Court approved it as a "sale" of assets under section 363 of the Bankruptcy Code and a "compromise" under Rule 9019 of the Federal Rules of Bankruptcy Procedure.

But the JIG Agreement was neither a "sale" nor a "compromise." It did not serve as a "compromise" because no pending or threatened dispute existed between the Trustee and JIG to compromise. And the JIG Agreement did not sell any estate

causes of action. Rather, the Trustee merely transferred to JIG the right to "control" those causes of action—a transaction that cannot constitute a sale of property.

In reality, the JIG Agreement was a *sub rosa* plan to end the Chapter 7 case in a manner that extinguished certain causes of action, prejudiced third-party rights, skirted the protections that secured creditors should enjoy in any bankruptcy sale, and avoided the protections that all creditors would enjoy in Chapter 11—including the right to vote on a plan or propose one of their own. Although the JIG Agreement was backed by only two proponents (who lacked any legitimate bankruptcy claims), and was opposed by everyone else, the Bankruptcy Court approved it anyway. And in attempting to short-circuit so many applicable rules, the Bankruptcy Court violated them all.

In short, the JIG Agreement represents a blatant abuse of the Trustee's powers and a violation of numerous creditor rights in contravention of both the letter and spirit of the Code. The Bankruptcy Court impermissibly approved that agreement and its ruling should be reversed.

**STATEMENT OF THE CASE**

### I.    Factual History

With Purpose, Inc. ("WPI") was founded in 2021 by Toby Neugebauer, a Dallas investor and entrepreneur, with the involvement of J. Nicholas Ayres, former chief of staff to Vice President Mike Pence. (ROA.16446-47, 23028) Operating under the name "GloriFi," WPI aimed to provide a comprehensive package of financial products, including credit cards, banking, insurance, mortgage, and brokerage services, to 100 million Americans who wanted to obtain such services from a company that shared their conservative values. (ROA.12529, 16419) Neugebauer became GloriFi's majority shareholder and CEO, and within months of its launch, its valuation skyrocketed to over $1 billion. (ROA.16419, 16440)

The strength of the GloriFi concept attracted investments from some of the biggest names in venture capital—people like Peter Thiel, founder of PayPal and other technology companies; Vivek Ramaswamy, investor and former presidential candidate; Jeffrey Sprecher, owner of the New York Stock Exchange; Richard Jackson, owner of Jackson Healthcare; and Ken Griffin, who invested through his hedge fund, Citadel. (ROA.16439, 25554, 25559) Together with Neugebauer and his family, these investors acquired over $50 million in "Series 1" unsecured convertible notes. (ROA.22816, 25081, 25554)

In early 2022, GloriFi obtained a lucrative opportunity to merge with DHC, a special purpose acquisition company, at a valuation of $1.65 billion. (ROA.26753) To raise the necessary funds and to cover GloriFi's growing operations, Neugebauer and others invested an additional $10 million in equity. (ROA.16493-94, 26065) GloriFi then sought to raise more capital through the issuance of "Series 2" secured convertible notes. (ROA.14997) From May through November 2022, various individuals and entities—including Neugebauer and his family businesses—invested over $36 million in these Series 2 secured notes. (ROA.14823, 14997, 25169) OnPoint Companies served as the collateral agent for the secured noteholders. (ROA.14997, 20118)

In the midst of this fundraising activity, the *Wall Street Journal* began investigating GloriFi. (ROA.25053) Neugebauer cooperated with the investigation, giving the WSJ reporter "every text and every email" he possessed. (ROA.26304) Although an internal investigation conducted by the law firm of Locke Lord found no evidence to support any claim against Neugebauer or GloriFi (ROA.22292), the WSJ still published an article on October 20, 2022 that portrayed GloriFi and Neugebauer in an unflattering light (ROA.22283). The investigations and the article destroyed GloriFi's ability to raise necessary funding. (ROA.11767, 25067) In short order, GloriFi's employees were let go, and OnPoint foreclosed on

6

the company's intellectual property assets to satisfy $7.5 million of the secured debt. (ROA.14999, 25056)

Meanwhile, Neugebauer discovered that Ayres and several of the outside investors had sought to wrest control of WPI, and when their takeover did not succeed, they caused liquidity crises and misappropriated WPI's confidential information and intellectual property in order to fund competing companies they had invested in, such as "Coign," "Strive," and others. (ROA.14995-96, 16419-20) For their part, Ayers and the outside investors, led by Richard Jackson, contended that WPI was the victim of Neugebauer's mismanagement and fiduciary breaches. (ROA.14996, 16073, 25615)

## II.    Procedural History

On February 8, 2023, WPI filed a voluntary Chapter 7 petition. (ROA.5259) Scott M. Seidel was appointed as the Chapter 7 Trustee. (ROA.11737) He determined that the estate's most valuable assets were its causes of action—which he valued between $1.0 billion and $4.95 billion (ROA.16084, 27881)—and concluded that "colorable causes of action exist against everyone that the proverbial finger has been pointed at, including Neugebauer and the early investors" (ROA.14996, 16061). But as the Bankruptcy Court would later put it, "[l]ooming over these disputes … was the fundamental questions of what claims and causes of action the estate owned, or which of the claims and causes of action, if any, were

owned by the Debtor's Collateral Agent." (ROA.11781, 14997) And yet the Bankruptcy Court did not attempt to resolve this critical dispute until months after entering the orders at issue in this appeal.

Controversy soon erupted over how, by whom, and against whom these causes of action should be asserted. In April 2024, the Trustee sought approval to sell the estate's causes of action through a public auction. (ROA.13388) Neugebauer and the new Collateral Agent (WPI Collateral Management) objected—concerned that the proposed bid procedure did not differentiate between encumbered and unencumbered causes of action and provided no mechanism for the Collateral Agent to credit bid on its secured interest in the collateral. (ROA.13450, 13923, 14342) When the Bankruptcy Court granted the Trustee's motion (ROA.14364), Neugebauer, his family companies, and the Collateral Agent filed a complaint in Georgia against Ayres, certain GloriFi outside investors, and others (ROA.29376, 29505-39). Neugebauer filed his own complaint in Delaware against some of the same defendants. (ROA.29184, 29256-65)[2]

The complaints filed in the DEGA Litigation stated that the plaintiffs were not seeking any claims for lost equity value in GloriFi or any other damages that might

---

[2] Throughout the bankruptcy proceeding, the parties and the court referred to the Delaware and Georgia lawsuits as the "DEGA Litigation" and the defendants named therein as the "DEGA Defendants." (ROA.11742) This brief will do the same.

belong to the estate. (ROA.29185, 29221, 29261, 29517, 29526, 29535-36) And counsel for Neugebauer and the Collateral Agent told the Trustee about the DEGA Litigation before filing it. (ROA.26551) But on May 30, 2024, the Trustee responded to the DEGA Litigation by filing an adversary proceeding against Neugebauer and the Collateral Agent seeking, among other relief, to resolve the disputes over ownership of the causes of action, to test the validity and extent of the Collateral Agent's security interests and prepetition foreclosure, and to hold Neugebauer and the Collateral Agent liable for allegedly violating the automatic stay (ROA.11743, 29126; *Seidel v. Neugebauer, et al.*, No. 24-03038-MVL (Bankr. N.D. Tex.)). Ultimately, the Bankruptcy Court did not decide the adversary proceeding until months after it entered the orders at issue in this appeal.

In July 2024, with the issue of ownership of the causes of action still unresolved and with many still unasserted (but with limitations looming), the Debtor tried to break the logjam by filing a motion to convert the case from a Chapter 7 to a Chapter 11. (ROA.14941) Before the motion could be heard, however, the Trustee reached a settlement with Neugebauer and the Collateral Agent. (ROA.14992) In his July 17, 2024 motion for approval of the settlement under Bankruptcy Rule 9019, the Trustee summarized the key terms of this agreement:

- The adversary proceeding would be resolved by agreement of the Trustee and Collateral Agent that (a) the Collateral Agent validly foreclosed on WPI's software and software assets only; (b) the Collateral Agent did not foreclose on any causes of action, such

9

that the estate owns whatever causes of action WPI held; and (c) the credit bid at the foreclosure sale would be reduced from $7.5 million to $4.0 million.

- The adversary proceeding would be further resolved by providing that (a) the Collateral Agent's security interest extends to causes of action sounding in contract and tort when related to damages to or misappropriation of trade secrets; and (b) the Collateral Agent holds no security interests in any other tort claims.

- The claims of the secured noteholders would be allowed.

- Neugebauer would not be released from any claims, which the Trustee could prosecute or sell.

- The Collateral Agent would pay $2.25 million to the estate, which would provide for all Chapter 7 administrative claims and leave $1 million to fund litigation. Additionally, the Collateral Agent would fund an initial $2.25 million postpetition loan to pay additional litigation expenses.

- The Trustee would pay $2.5 million to the secured noteholders.

- The Trustee, the Collateral Agent, and Neugebauer would enter into a Joint Prosecution Agreement pooling their causes of action to jointly pursue them in Georgia, Delaware, and elsewhere through a special litigation counsel, with the proceeds distributed through a waterfall in which unsecured creditors would share.

(ROA.15002-03, 15012-30) The 9019 motion was set for hearing on August 15, 2024, and the Debtor's motion to convert and the adversary proceeding were abated. (ROA.11744, 15055)

But then Jackson Investment Group ("JIG"), which is owned by Richard Jackson and included among the DEGA Defendants, approached the Trustee with an alternate plan (ROA.26574-75)—one that would thwart any efforts to hold JIG

10

or the DEGA Defendants liable for GloriFi's demise. Despite having already entered into and sought court approval of the agreement with the Collateral Agent and Neugebauer, the Trustee ultimately withdrew that agreement, deemed the JIG proposal to be "better," and filed a motion on August 12, 2024 seeking "Approval of Compromise and Settlement Under Bankruptcy Rule 9019 and Sale of Assets"— even though the agreement with JIG was neither a compromise, a settlement, nor a sale. (ROA.16055, 16058)

The Trustee summarized the key provisions of his agreement with JIG as follows:

- The Trustee would continue to pursue the adversary proceeding against the Collateral Agent in attempt to defeat his liens.

- JIG's Agent (GloriFi Acquisitions) would pay $100,000 to the estate to acquire the Debtor's and estate's rights in the name "GloriFi" and equity in any subsidiaries.

- JIG's Agent would pay $6 million to the estate to cover administrative claims and litigation expenses to pursue claims against Neugebauer and related parties.

- JIG's Agent and the Trustee would enter into a Joint Prosecution Agreement giving JIG's Agent sole authority to control the estate's causes of action and decide which should be prosecuted in the name of the Trustee or not prosecuted. At a minimum, JIG's Agent would be required to assert claims against Neugebauer. No causes of action would be sold and no parties released.

- From any litigation proceeds, special litigation counsel would be paid, JIG's Agent would receive a preferential payout of $6

11

million plus interest, and the remainder would be distributed to JIG's Agent and the estate under a sliding-scale waterfall.

- JIG's $10 million unsecured claim would be allowed in full.

- The parties would seek a permanent stay or dismissal of the DEGA Litigation.

(ROA.16064, 16070-80, 27858-69)

Meanwhile, in response to the Bankruptcy Court's August 1, 2024 invitation to submit competing offers, indicating that "[i]t is time at this juncture to put up or shut up" (ROA.16212), the Collateral Agent made a "final proposal" that included the following terms:

- The Collateral Agent will make a credit bid of $20 million for ownership of all causes of action in which it has a security interest in either the cause of action or the proceeds from the cause of action (the "Collateral Agent Claims").

- The Collateral Agent will pay the estate $750,000, with $500,000 being used to pay administrative claims and $250,000 reserved for distribution to unsecured creditors.

- If JIG matches the $750,000 payment, it will obtain ownership of the estate's causes of action against Neugebauer. If it does not match, the Collateral Agent will pay an additional $500,000 to cover administrative claims.

- A Liquidating Trust will be formed to prosecute the Collateral Agent Claims and the estate claims not purchased by the Collateral Agent or JIG (the "Unsecured Estate Claims").

- The Collateral Agent will provide the Liquidating Trust with $3 million to prosecute all claims and will assist in obtaining additional litigation funding for attorney's fees as necessary.

12

- Proceeds from the Unsecured Estate Claims will be distributed under a waterfall that pays for attorney's fees, litigation costs, estate administrative claims, and unsecured claims, with any remainder going to the Collateral Agent.

(ROA.15667-69)

For its part, the Debtor amended its previously-filed motion to convert the case to a Chapter 11 pursuant to 11 U.S.C. § 706(a). (ROA.16273) And this was no ordinary request for conversion: It was a well-thought-out and complete proposal that included the following features:

- A Restructuring Support Agreement signed by the Collateral Agent and the secured noteholders, several unsecured creditors holding over $5 million in claims, and a majority of WPI's shareholders. (ROA.16287-16320)

- The engagement of a Chief Restructuring Officer (former Bankruptcy Judge Leif Clark) to oversee the Chapter 11 and address any conflicts of interest. (ROA.21981, 26460)

- A $2 million debtor-in-possession loan facility, funded by the secured creditors and the Collateral Agent, to pay up to $1 million in Chapter 7 administrative expenses, administrative expenses incurred in the Chapter 11 case, and expenses of the Litigation Trust. (ROA.16288)

- A plan and disclosure statement that would: (a) create a Litigation Trust to pursue all estate causes of action for the benefit of all creditors, excluding claims against Neugebauer that will be sold for at least $4 million; (b) establish a distribution waterfall for the net recoveries to the Litigation Trust; (c) provide unsecured creditors and equity interest owners beneficial interests in the Litigation Trust; and (d) settle the adversary proceeding. (ROA.16321, 16334, 16348)

- A fully drafted complaint asserting the estate's causes of action against the DEGA Defendants. (ROA.16418)

13

The Bankruptcy Court heard both the amended motion to convert and the motion to approve the JIG Agreement over seven days in September and October 2024, eliciting testimony from a series of witnesses including former Bankruptcy Judge Clark, Neugebauer, Ayres, Jackson, the Collateral Agent's principal, and the Trustee. (ROA.11746-54) On December 6, 2024, the court orally announced from the bench that it would deny the motion to convert and grant the JIG settlement motion. (ROA.27377-94) The court then memorialized both rulings in a Memorandum Opinion entered on January 22, 2025. (ROA.11737)[3]

In analyzing the Trustee's motion to approve the JIG Agreement, the Bankruptcy Court concluded that the Trustee had authority to enter into the agreement pursuant to his power to "sell" estate assets under section 363 of the Code and his power to "compromise" litigation claims under Rule 9019. (ROA.11796, 11809)

The court concluded that the JIG Agreement constituted a valid "sale" under section 363, despite recognizing that the Trustee would retain the causes of action under the agreement: "[N]o causes of action are being sold," and the only rights assigned to JIG's Agent would include the right to "control" those causes of action

---

[3] The appeal from the order denying the motion to convert is the subject of the Debtor's appellate brief, which the Collateral Agent joins.

with "sole authority to prosecute, not prosecute, negotiate, settle or otherwise dispose or not dispose of the Estate's causes of action." (ROA.11775-76, 11797)

The court also concluded that the JIG Agreement constituted a valid "compromise" to settle "litigation" "claims" under Rule 9019. (ROA.11776) And it analyzed the "compromise" according to a series of factors set forth in this Court's decision in *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 355-56 (5th Cir. 1997) for evaluating the settlement of claims asserted in "litigation." (ROA.11776, 11778)

Yet the Trustee never brought any litigation against JIG (or *vice versa*), and the JIG Agreement did not purport to resolve even *potential* claims between them. Indeed, the agreement actually required certain litigation to continue—providing that the Trustee's adversary proceeding asserted against the Collateral Agent and Neugebauer must be "diligently prosecute[d]" by the Trustee. (ROA.27862) And the only "claims" that were "compromised" or "settled" in the JIG Agreement belonged to third parties. These included the Collateral Agent's claims in the DEGA Litigation (which the Trustee and JIG agreed to permanently stay or dismiss) (*see* ROA.27862) and the Collateral Agent's objection to JIG's proof of claim (which the Trustee and JIG purported to reject by "agree[ing] to allow[]" JIG's claim in full) (*see* ROA.27858, 27864).

15

In determining whether the supposed "compromise" embodied in the JIG Agreement was in the best interest of creditors, the Bankruptcy Court compared it to the Trustee's previous agreement concerning the estate causes of action embodied in the "Neugebauer 9019 motion" and noted that it had invited other parties to "propose that the estate should go down a different path." (ROA.11784) But after deciding that the time had come for new entrants to "put up or shut up" (*id.*), the court overlooked the proposal that the Collateral Agent actually "put up" (*id.*). The court therefore determined that the JIG Agreement was in the "best interests of the estate" and its "creditors" (ROA.11789-91)—even though it was opposed by all the secured creditors and other important bankruptcy constituencies, its only supporters included those who would directly benefit from it, and it handed over control of the estate's causes of action to JIG, one of the targets of those causes of action.

Two days after issuing its Memorandum Opinion, the Bankruptcy Court signed orders on both the motion to convert to Chapter 11 and the motion to approve the JIG Agreement. (ROA.11805, 11806) The Collateral Agent and the Debtor timely appealed. (ROA.2335)[4]

---

[4] After filing their notice of appeal, the appellants sought to stay certain parts of the order approving the JIG Agreement, but the Bankruptcy Court and the District Court denied their stay motions. (ROA.28902) Appellants did not pursue stay relief in this Court because, among other reasons, the JIG Agreement does not involve any "sale of property" that could potentially give rise to statutory mootness under 11 U.S.C. § 363(m). (*See* Part II(A), below)

**SUMMARY OF THE ARGUMENT**

The Bankruptcy Court should not have acceded to JIG's blatant effort to obtain absolution for itself and its allies at the expense of the creditors and the estate as a whole. The JIG Agreement exceeds the most fundamental limits on a trustee's ability to dispose of property in a Chapter 7 proceeding. While the motion to approve the JIG Agreement billed itself as a "sale" and a "compromise"—evoking a trustee's authority to "sell" property under section 363 of the Code and a trustee's right to "compromise" litigation under Rule 9019—the agreement was neither a sale nor a compromise. Apart from an immaterial compromise of the GloriFi name and equity in subsidiaries, the agreement contemplated no sale. It merely attempted to transfer to a private party the Chapter 7 trustee's power to "control" the estate's causes of action: to "decid[e] what actions to bring and what are not worth the expense." (ROA.11778-79) (quoting *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 812 (Bankr. N.D. Tex. 2009))  But that is a fiduciary responsibility a trustee cannot sell.  And the transaction could not be considered a sale because, if it were, it would violate the rights that Congress has granted to secured creditors in sales under section 363.

The JIG Agreement also cannot be approved as a Rule 9019 "compromise." Section 9019 exists to allow trustees to settle litigation under bankruptcy court supervision. But there was no actual or even threatened litigation between the Trustee and JIG to settle; the Trustee had not even objected to JIG's proof of claim.

17

The agreement itself also involved no "compromise"—the only rights that the Trustee and JIG gave up belonged to others. And the agreement was not entered through "arm's length" bargaining between litigation adversaries, but through collusive planning between parties who had no disputes to settle.

If the JIG Agreement is anything, it is a *sub rosa* plan, designed to end the Chapter 7 case in a manner that skirts the protections extended to secured creditors in any *real* sale under 363, and the rights *all* creditors would enjoy if the case were converted to a Chapter 11 proceeding. For all these reasons, the Trustee lacked statutory authority to enter into the JIG Agreement, and the Bankruptcy Court lacked authority to approve it.

Yet even if the Bankruptcy Court had the raw power to approve the JIG Agreement, it erred in its exercise of that power—exceeding fundamental Code requirements in numerous respects. It is axiomatic that bankruptcy courts cannot approve agreements that operate to contravene the rights of non-consenting creditors under the Code. Yet the JIG Agreement does that in numerous ways. For one, the Code imposes on a trustee a non-delegable duty to decide which claims will maximize recovery for the benefit of the estate. But the JIG Agreement violates the trustee's fiduciary duty not only by impermissibly delegating it to another, but also by handing that duty over to JIG—a litigation target who will exercise its new

18

powers with an eye toward maximizing benefit for itself at the expense of estate creditors.

The Code likewise forbids the forcible, non-consensual release of one non-debtor's claim against another, but the JIG Agreement operates as a *de facto* non-consensual release in numerous respects. Not only does the JIG Agreement virtually ensure that the estate will not pursue litigation against JIG or the other DEGA Defendants, it also forces the Collateral Agent to give up its own claims against those parties—assigning sole control over those claims to JIG, requiring the dismissal of the DEGA Litigation, and "allowing" JIG's $10 million proof of claim over the Collateral Agent's objection without a hearing.

In the end, the Bankruptcy Court failed in its obligation to ensure that the JIG Agreement served the best interests of the estate. After inviting the parties to submit proposals that might compete against the JIG Agreement, the court could not legitimately evaluate whether the Trustee was getting the best possible deal for the estate without also evaluating all available alternatives—so its failure to even consider the Collateral Agent's final proposal infected its analysis and led to reversible error. The court also failed to consider the numerous ways in which the JIG Agreement's essential terms were inferior to both the Trustee's previous settlement with Neugebauer and the Collateral Agent and the Collateral Agent's final proposal. Both of those alternatives would have preserved *all* estate causes of

action and ensured they were asserted against *all* potentially responsible parties, instead of handing them over to litigation targets who would release themselves from liability. And the Collateral Agent's final proposal provided a superior likelihood that junior creditors would recover. Not only did that proposal guarantee a cash recovery for unsecured creditors, but it included a $20 million credit bid that vastly exceeded JIG's $6 million payment. At the very least, the court should have conferred derivative standing on the Collateral Agent to prosecute claims that the Trustee and JIG were unwilling to assert. The court reversibly erred in concluding otherwise.

## ARGUMENT

### I.    Standard of Review

Although bankruptcy-court orders approving settlements under Rule 9019 or sales under section 363 are ordinarily reviewed for an abuse of discretion, the JIG Agreement that the Bankruptcy Court approved is neither a settlement of any disputes nor a sale of any causes of action.  It is, instead, a *sub rosa* plan that effectuates an end to a Chapter 7 proceeding by short-circuiting the protections of the Code. Whether the Trustee was authorized to enter into such a transaction, and whether the Bankruptcy Court was authorized to approve it, are legal questions reviewed de novo. *See Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 939-40 (5th Cir. 1983) (examining de novo

20

whether a transaction established the terms of a reorganization plan *sub rosa* in connection with asset sales); *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.*), 119 F.3d 349, 354 (5th Cir. 1997) (reviewing de novo district court's legal conclusion that settlement did not effect a *sub rosa* reorganization plan). Similarly, "mixed questions of fact and law" are reviewed de novo, *Century Indem. Co. v. Nat'l Gypsum Settlement Trust (In re Nat'l Gypsum Co.)*, 208 F.3d 498, 504 (5th Cir. 2010), as are "[i]ssues of statutory interpretation," *Jacobsen v. Moser (In re Jacobsen)*, 609 F.3d 647, 652 (5th Cir. 2010) (internal citation omitted). And even under an abuse-of-discretion standard, a decision will be reversed when it relies on an erroneous legal conclusion or misapplies the law to the facts. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 310 (5th Cir. 2008) (en banc).

## II.   The Trustee lacked statutory authority to enter into the JIG Agreement.

The Trustee sought approval of the JIG Agreement as a "sale" and a "compromise"—invoking both a trustee's power to sell estate assets under section 363 of the Code and his authority to settle controversies under Rule 9019. But the JIG Agreement constitutes neither a sale nor a compromise. It is instead a *sub rosa* plan of liquidation that the Trustee lacked statutory authority to enter into and the Bankruptcy Court lacked statutory authority to approve.

21

**A.    The JIG Agreement did not constitute a sale of estate claims in compliance with section 363.**

The defining feature of a Chapter 7 bankruptcy is the appointment of a trustee to "liquidat[e] … the debtor's assets" and "distribute[] the proceeds to creditors." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007). The trustee is required to "collect and reduce to money the property of the estate." 11 U.S.C. § 704(a)(1). The trustee can liquidate estate assets either through a "public auction or private sale." FED. R. BANKR. P. 6004. But any sale of estate assets must comply with the terms of section 363(b). And for a variety of reasons, the JIG Agreement does not fall within the trustee's authority to sell assets under section 363(b).

**1.    The JIG Agreement did not actually sell any estate claims.**

The first and most basic problem with the JIG Agreement is that, as to the estate's causes of action, the agreement does not qualify as a "sale" at all. As the Bankruptcy Court acknowledged, the Trustee would retain title to the estate's causes of action under the agreement: "[N]o causes of action are being sold." (ROA.11176) And other than the GloriFi name and some subsidiaries, the only asset that JIG claims to have "bought" in the transaction is the right to "control" the estate's causes of action by receiving "sole authority to prosecute, not prosecute, negotiate, settle or otherwise dispose or not dispose of" them. (ROA.11795-96, 27861)

But the right to "control" a cause of action owned by the estate is not "property" that can be "sold." While property is commonly considered a "bundle of sticks," that bundle is not so infinitely divisible as to suggest that the right to control the "stick" *someone else owns* is a cognizable property interest. Neither the Bankruptcy Court, the Trustee, nor JIG identified any case—anywhere—supporting such a notion. That is because the right to "control" property is not divisible from the property itself. It is instead the "defining feature" of property ownership: He who *controls* an asset necessarily *owns* the asset. *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007). Accordingly, the right to "control" an asset must remain with its true owner and cannot be "sold" to a third party. That means the right to control the estate's causes of action must remain with the Trustee.

Further, a trustee's right to control decision-making relating to an estate cause of action is intrinsically connected to, and inseparable from, the trustee's core fiduciary duty in Chapter 7: the responsibility to independently protect the estate through the "safeguarding and responsible disposition of estate assets." *In re Guyana Dev. Corp.*, 201 B.R. 462, 476-77 (Bankr. S.D. Tex. 1996) (quoting *In re Abraham,* 163 B.R. 772, 779 (Bankr. W.D. Tex. 1994)). As the Bankruptcy Court acknowledged, that duty requires the trustee to "exercise reasonable business judgment in deciding what actions to bring and what are not worth the expense." (ROA.11778-79) (quoting *Reed v. Cooper (In re Cooper)*, 405 B.R. 801, 812 (Bankr.

23

N.D. Tex. 2009)).  This "discretionary power," *Transamerican Leasing Co. v. Three Bears, Inc.*, 586 S.W.2d 472, 476 (Tex. 1979), is a core fiduciary duty that is "neither transferable nor delegable." *NCNB Texas Nat'l Bank v. Cowden*, 895 F.2d 1488, 1495 (5th Cir. 1990) (citing *Transamerican Leasing Co.,* 586 S.W.2d at 476). *See also* RESTATEMENT (SECOND) OF AGENCY § 18 (1958) ("Trustees cannot delegate to others the use of discretion in exercising their powers.").

The Bankruptcy Court nevertheless concluded that the JIG Agreement succeeded in separating the Trustee's fiduciary duties from his control of the causes of action, conveying the latter to JIG while allowing the Trustee to "retain his own independent discretion and fiduciary relationship" to the court.  (ROA.11796)  But this asserted division between fiduciary duty and control is an illusion.

According to the Bankruptcy Court, the JIG Agreement preserved the trustee's fiduciary duty by requiring JIG and its Agent to obtain his "approval" of certain litigation decisions. (ROA.11776 n.14, 16073, 27861) But the JIG Agreement does *not* actually preserve the Trustee's fiduciary duty to direct *all* litigation decisions. JIG and its Agent are required to obtain the Trustee's "approval" only for decisions concerning the "non-suiting, dismissing, or settling Estate Causes of Action." (ROA.27861) In contrast, JIG and its Agent are *not* required to obtain the Trustee's approval of decisions to "prosecute [or] not prosecute" estate causes of action. (*Id.*) For that, the Agent is obliged merely to "consult with" the Trustee—

24

and the JIG Agreement is silent on whether the Trustee can do anything if he disagrees with the Agent's decision not to prosecute after such consultation. (*Id.*) That abdicates the Trustee's control over the most critical decisions in this case: those involving *which* causes of action to bring (or not bring), and against *whom* they should be brought (or not brought).

Accordingly, to the extent the parties to the JIG Agreement sought to preserve the Trustee's fiduciary duty to manage estate causes of action, they necessarily had to leave in place the Trustee's ultimate control over those causes of action—meaning no sale of property occurred. But to the extent the JIG Agreement did strip the Trustee of control, it necessarily also stripped his fiduciary duty—a conveyance that cannot occur. Either way, the JIG Agreement's supposed transfer of "control" cannot constitute a "sale" under section 363 and therefore cannot fall under a trustee's power to "sell" property.[5]

---

[5] Because the Trustee did not sell any causes of action, the provisions of section 363(m)—which prevent an appellate court from reversing or modifying an unstayed order authorizing the "sale or lease" of property—do not apply here. *See, e.g.*, *PricewaterhouseCoopers, LLP v. Giddens (In re MF Global Inc.)*, 496 B.R. 315, 320 (S.D.N.Y. 2013) (section 363(m) did not affect accounting firm's appeal because "the Trustee did not sell or lease, but instead assigned, its claims" against the firm to a coalition of plaintiffs); *S'western Bell Tel. Co. v. Long Shot Drilling, Inc. (In re Long Shot Drilling, Inc.)*, 224 B.R. 473, 478 (10th Cir. B.A.P. 1998) (section 363(m) inapplicable "because the orders appealed from do not involve the sale of the Debtor's assets" but instead involved the sale of stock that "was not an asset of the Debtor's estate").

### 2. The JIG Agreement could not have sold any estate claims without violating the Code.

Not only did the JIG Agreement *not* sell any estate claims within the contemplation of section 363, it *could not* do so without violating the requirements of that section—specifically, the rights provided in section 363 for the protection of secured creditors like those the Collateral Agent represents.

The Code is "especially solicitous of the rights of secured creditors" because "[s]ecured credit represents property rights that ultimately find a minimum level of protection in the takings and due process clauses of the Constitution." *Bank of New York Trust Co. v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d 229, 240, 243 (5th Cir. 2009). For that reason, section 363 "sets out in detail" a series of protections to ensure "that the interest that the secured creditor has in the property is protected, and that no erosion forbidden by the constitution takes place." H.R. Rep. 95-595, at 182-83 (1978).

"According to § 363(d), the ... sale or lease of estate property is authorized under section 363(c) 'only to the extent not inconsistent with any relief granted under section 362(c), 362(d) , 362(e)  or 362(f).'" *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986 (quoting 11 U.S.C. § 363(d)(2)). And the trustee may sell estate property "free and clear" of a secured party's lien only if certain conditions

26

listed in section 363(f) are satisfied.[6]  Furthermore, beyond those conditions, "debtors may not sell their property free of liens without allowing a lienholder to credit bid": a practice allowing a secured creditor to purchase property by offering to extinguish all or a portion of the debt owed instead of offering cash to fund the purchase price. *Baker Hughes Oilfield Operations, Inc. v. Morton* (*In re R.L. Adkins Corp.*), 784 F.3d 978, 979 (5th Cir. 2015) (citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)). This ability to credit bid is vital to protect the "creditor against the risk that its collateral will be sold at a depressed price" and "enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan." *RadLAX*, 566 U.S. at 644 n.2. Finally, any sale must be

---

[6] Section 363(f)  allows a sale free and clear of liens "only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."

conditioned to provide the secured creditor with "adequate protection" for its interest. *See* 11 U.S.C. § 363(e).

The JIG Agreement purported to convey control over estate causes of action "free and clear of any and all liens, claims and encumbrances of any kind or type." (ROA.27864) But there is no question that the secured creditors had a valid security interest in (at the very least) the estate's causes of action for breach of various prepetition contracts and damage to intellectual property. (ROA.14648, 15006) That security interest would unquestionably adhere to the right to "control" such causes of action. And because JIG's Agent was given the sole authority not to prosecute those causes of action, the JIG Agreement would violate the protections section 363 provides to secured creditors if the agreement could somehow be treated as a "sale" of the causes of action.

The JIG Agreement could not cure this problem by providing that net proceeds from "encumbered" estate causes of action would be "held by the Trustee pending further order of the Court." (ROA.27864) The JIG Agreement made no effort to specify how any litigation proceeds could be allocated among "encumbered" and "unencumbered" causes of action. And the limited protection the JIG Agreement provides to secured creditors by cordoning off proceeds from claims covered by their liens exists only so long as an encumbered cause of action is actually prosecuted to a successful conclusion. It offers secured creditors nothing if those causes of action

28

are abandoned or never prosecuted—a realistic and problematic consequence of JIG's authority to dismiss the DEGA Litigation and its causes of action against the DEGA Defendants for breaching various contractual provisions. (ROA.29529-38) Granting JIG and its Agent such broad authority over encumbered claims (and their proceeds) cannot be viewed as a "sale" of property under section 363 without violating the statutory protections provided to the secured creditors and the Collateral Agent. This is an additional reason the JIG Agreement could not have constituted any "sale" of estate claims.

### B. The JIG Agreement was not a compromise of litigation that could be approved under Rule 9019.

The JIG Agreement also cannot be justified as any "compromise" that the Trustee could enter (or the Bankruptcy Court could approve) under Rule 9019. As the Bankruptcy Court recognized, this Court has consistently reserved Rule 9019 for approvals of "litigation" compromises. (ROA.11777-78) (citing *Cajun Elec. Power Coop.*, 119 F.3d at 355–56). Indeed, the factors this Court has directed bankruptcy courts to consider in deciding whether to approve Rule 9019 compromises are formulated exclusively in terms of "litigation," requiring consideration of "the probability of success in the *litigation*" as well as "the complexity and likely duration of the *litigation* and any attendance expense." (ROA.11777-78) (emphasis added) (citing *Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980); *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage*

*Co.)*, 68 F.3d 914, 917-18 (5th Cir. 1995)). And the overall objective of this analysis is to determine whether "the compromise falls within the 'range of reasonable *litigation* alternatives.'" (ROA.11777) (emphasis added) (quoting *In re Roqumore,* 393 B.R. 474, 480 (Bankr. S.D. Tex. 2008)). These factors for analyzing litigation settlements are impossible to apply in the absence of litigation, confirming that non-litigation "compromises" simply do not fall under Rule 9019.

But that is precisely the problem with the JIG Agreement because there was no litigation pending or even threatened between JIG and the Trustee when they entered into the agreement. Thus, the agreement does not purport to terminate any *previous* litigation between the parties or force them to give up any right to pursue *future* litigation. And there is no mutual release of any claims between them. For this reason alone, the JIG Agreement could not be approved as a "compromise" under Rule 9019.

Another problem arises because the JIG Agreement does not even purport to be a "compromise" between the Trustee and JIG. A "compromise" occurs when parties agree that each should give up something to end some dispute between them. *See Compromise*, BLACK'S LAW DICTIONARY (10th ed. 2024) (A "compromise" is "[a]n agreement between two or more persons to settle matters *in dispute* between them; an agreement for the settlement of a real or supposed claim in which *each party* surrenders something in concession to the other") (emphasis added). Yet

30

neither the Trustee nor JIG gave up anything to settle any dispute between them. Although the JIG Agreement recited that the parties "have agreed to settle the allowance of the claim" filed by JIG (ROA.27858), the Trustee could not "settle" the allowance of that claim because he had never asserted an objection to it—only the Collateral Agent had done so. (ROA.15229-35) Indeed, the Trustee insisted that he had examined both the proof of claim as well as the Collateral Agent's objection and decided that JIG "had the better argument" concerning the validity and extent of the claim. (ROA.26761) So the Trustee never disputed whether that proof of claim ought to be allowed and he never required JIG to give up anything in return. He merely tried—impermissibly—to "settle" the objection of the Collateral Agent.

Further demonstrating that it was not a "compromise," the JIG Agreement required that at least one piece of litigation—the adversary proceeding brought by the Trustee against the Collateral Agent and Neugebauer—would *not* be compromised but instead must be "diligently prosecute[d]" by the Trustee. (ROA.27862) And the only disputes that *were* given up in the agreement involved those of third parties—specifically, the Collateral Agent's objection to JIG's claim and the Collateral Agent's right to pursue the DEGA Litigation, which the agreement required the Trustee and JIG to permanently stay or dismiss. (ROA.27862) But an agreement to force third parties to give up *their* rights is not a "compromise" between the contracting parties. Accordingly, the Trustee was not empowered to enter into

31

the JIG Agreement as a "compromise" under Rule 9019, and the Bankruptcy Court erred by evaluating it under Rule 9019's framework.

### C.    The JIG Agreement is a *sub rosa* plan.

Not only does the JIG Agreement fall outside any legitimate exercise of the powers granted to a Chapter 7 Trustee under section 363 and Rule 9019, its true purpose is an *illegitimate* one: to "short-circuit" the protections that creditors should enjoy in a true Chapter 7 sale or in any Chapter 11 proceeding—including the right to vote on any plan. *Braniff*, 700 F.2d at 940. That makes the JIG Agreement a *sub rosa* plan—providing yet another reason why the Bankruptcy Court lacked authority to approve it.

Both this Court and the Supreme Court have held that parties may not effectuate an "end run around the protection granted creditors in Chapter 11 of the Bankruptcy Code" by "sidestepping" the process that leads to a plan of reorganization. *Continental*, 780 F.2d at 1224, 1227 (citing *Braniff*, 700 F.2d at 940); *Czyzewski v. Jevic Holding Corp*., 580 U.S. 451, 469 (2017) (prohibiting bankruptcy court from approving a "structured dismissal[]" of a bankruptcy that distributed assets in a manner violating the Code's priority scheme)).

Accordingly, bankruptcy courts "lack the power to approve" any transaction that amounts to such a "*sub rosa*" plan. *Braniff*, 700 F.2d at 940; s*ee also Continental*, 780 F.2d at 1227; *Jevic Holding*, 580 U.S. at 469. Instead, bankruptcy

courts must treat such agreements as mere "proposals" for reorganization—and grant creditors all the protections of Chapter 11 before those proposals can be approved. *Continental*, 780 F.2d at 1227-28. *See, e.g.*, 11 U.S.C. § 1125 (disclosure requirements); *id.* § 1126 (voting); *id.* § 1129(a)(7) (best interest of creditors test); *id.* § 1129(b)(2)(B) (absolute priority rule).

While *Jevic Holding*, *Braniff*, and *Continental* were all decided in the Chapter 11 context—rather than Chapter 7—the principles they adopt apply to *any* attempt to "circumvent the Code's procedural safeguards." *Jevic Holding*, 580 U.S. at 468. And these cases prohibited transactions as impermissible *sub rosa* plans in several different circumstances. For example, plans become *sub rosa* when they arise from a transaction that "seeks to alter parties' rights" under the Code "without their consent." *Jevic Holding*, 580 U.S. at 469. Likewise, transactions impermissibly stray into *sub rosa* territory when they effectively dispose of all assets of the debtor outside a Chapter 11 plan, leaving "little prospect … for … reorganization." *Braniff*, 700 F.2d at 940.

The JIG Agreement strays precisely into this *sub rosa* territory. There is no question that the JIG Agreement was meant to circumvent the rights of creditors and others under Chapter 11: It arose only after the Debtor filed its motion to convert the case to Chapter 11 (ROA.14941), and JIG admitted that its agreement with the Trustee was meant to provide a "defense" against the Chapter 11 conversion

(ROA.11754). The agreement also contains several features that have been deemed to be attempts to evade Chapter 11 protections. Not only does it seek to alter the rights of third parties under the Code—including by extinguishing or compromising third parties' claims or objections—it also disposes of private parties' right to pursue claims against JIG or other defendants, by giving JIG's Agent the sole authority to prosecute them.

Accordingly, the JIG Agreement—like the agreements condemned in *Jevic Holding*, *Braniff*, and *Continental*—represents an impermissible attempt to short-circuit the bankruptcy process by avoiding the protections that parties would enjoy in Chapter 11 and imposing a liquidation plan by private agreement and judicial fiat. For this additional reason, the Trustee was not authorized to enter into the JIG Agreement under the auspices of section 363 and Rule 9019.

## III.  The Bankruptcy Court erred in approving the JIG Agreement.

Even if the Trustee had the raw power to enter into the JIG Agreement, the Trustee abused that power in numerous respects. And the Bankruptcy Court erred in approving it. It is axiomatic that parties cannot enter into agreements that would violate the rights of third parties under the Code "without the consent of the affected parties." *Jevic Holding*, 580 U.S. at 454. But the JIG Agreement violates the rights of creditors in multiple ways.

**A.** **The JIG Agreement impermissibly assigned control of the estate's claims to a target of those claims, thus violating the Trustee's fiduciary duty to the estate.**

One insurmountable problem with the JIG Agreement is that it breaches the Trustee's duties as estate fiduciary. Section 704(a) of the Code sets forth the duties of Chapter 7 trustees, requiring them to "collect and reduce to money the property of the estate for which such trustee serves," to "be accountable for all property received," and to "investigate the financial affairs of the debtor." The trustee must perform these duties as "fiduciary"—ensuring that those duties are conducted "in the best interests of the estate." *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992) ("[T]he chapter 7 trustee is charged with the fiduciary duty to administer the chapter 7 estate expeditiously in the best interests of the estate."); *see also* RESTATEMENT OF TRUSTS § 170(1) (1935) ("The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.").

Disregarding these bedrock principles, the Trustee violated his duty to administer the estate in the creditors' best interest by delegating his "control" over estate causes of action to JIG—and, in significant respects, failing even to retain any power to supervise JIG's exercise of that control. For a bankruptcy trustee, "[t]here is one … 'duty' that can never be delegated": the "ultimate[] responsib[ility] for the administration of the estate, including the safeguarding and responsible

35

disposition of estate assets," and the supervision of "those persons to whom duties have been delegated." *In re Abraham*, 163 B.R. at 779; RESTATEMENT OF TRUSTS § 171 & cmt. b., illus. 1 (1935) (trustee has a "duty to personally perform his duties as a fiduciary" and even "in matters which a trustee has properly delegated to agents … he is under a duty to the beneficiary to exercise a general supervision over their conduct."). A trustee violates these duties if he "delegate[s] his discretionary power to another." *Transamerican Leasing Co.*, 586 S.W.2d at 476; *see also Weingartner v. Chase Home Fin., LLC*, 702 F. Supp. 2d 1276, 1281 n.2 (D. Nev. 2010) (trustee violated his non-delegable fiduciary duties by "mak[ing]" another person "the trustee in its stead"). So the Trustee's agreement to delegate his fiduciary duty to JIG's Agent to administer the estate causes of action, while retaining virtually no power to supervise the Agent's litigation decisions, constitutes a breach of his duties under section 704.

Even worse, the Trustee delegated "control" to an entity that is entirely unfit to wield it. JIG sought to have its Agent obtain such "control" to ensure that the causes of action would never be prosecuted against JIG or the other DEGA Defendants allied with it. Assigning a task to such a conflicted entity constitutes a blatant violation of the Trustee's duty of loyalty to the estate. "Perhaps the most fundamental duty of a trustee is the trustee's duty of loyalty to the beneficiaries, often stated as the duty to act solely in the interests of the beneficiaries." BOGERT,

THE LAW OF TRUSTS AND TRUSTEES § 543 (2025 ed.). When the Trustee delegated his discretionary authority to JIG's Agent, *knowing* that the Agent would act for the benefit of JIG's interests rather than the best interests of the estate, the Trustee breached *his own* duty to act in the estate's best interests.

The only justification the Bankruptcy Court could offer for this abdication of the Trustee's section 704 duty simply missed the mark. The court asserted that the Collateral Agent could not complain about the JIG Agreement because the "meat and bones" for that agreement purportedly came from the Trustee's previous settlement agreement with the Collateral Agent and Neugebauer—which the court believed to contain an "identical framework" and "almost identical terms" as the JIG Agreement. (ROA.11793-94) But the two agreements are materially different. Nothing in the Collateral Agent-Neugebauer settlement agreement required the Trustee to assign "control" over estate causes of action to anyone else. And in stark contrast to the JIG Agreement, the Collateral Agent-Neugebauer settlement agreement did not give sole authority to a litigation target to decide what causes of action would not be prosecuted. To the contrary, the settlement ensured that *all* estate causes of action would be jointly prosecuted, with the *Trustee* retaining "sole authority to prosecute, not prosecute, negotiate, settle or otherwise dispose or not dispose" of the estate causes of action against Neugebauer. (ROA.15017, 15020-21)

In any event—in what would become a pattern in its analysis—the Bankruptcy Court's "you did it first" rationale is ultimately misdirected. By measuring the appropriateness of the JIG Agreement against the appropriateness of the Collateral Agent-Neugebauer agreement, the court effectively penalized all the estate's creditors for the alleged excesses of a single creditor: Neugebauer. That approach is not defensible. And it is yet another reason why the court erred in approving the JIG Agreement.

### B.    The JIG Agreement impermissibly created a *de facto* release of one non-debtor's claims against another.

The JIG Agreement also transgressed fundamental bankruptcy principles by creating an improper *de facto* non-consensual release of claims between one non-debtor and another in violation of *Harrington v. Purdue Pharma, L.P*., 144 S. Ct. 2071 (2024). In *Purdue Pharma*, the Supreme Court held just last term that "[t]he bankruptcy code does not authorize" parties to "discharge claims against a non-debtor without the consent of affected claimants." *Id*. at 2088.

But the JIG Agreement operates as an impermissible non-consensual third-party release in several respects. Not only does it ensure that the *estate* will not pursue litigation against JIG or the other DEGA Defendants, it also forces the Collateral Agent and Neugebauer to give up their own claims against those parties by assigning the exclusive right to control those claims to JIG and requiring the dismissal of the claims the Collateral Agent and Neugebauer asserted in the DEGA

38

Litigation. (ROA.27862) The JIG Agreement further requires the allowance of JIG's proof of claim notwithstanding the Collateral Agent's objection. (ROA.27864) Those features of the JIG Agreement—which only the Trustee, JIG, and Ayres approved—constitute impermissible releases under *Purdue Pharma*.

### C. The JIG Agreement impermissibly allowed JIG's claim in full without adjudicating the Collateral Agent's objections to that claim.

Beyond its erroneous approval of the JIG Agreement as a whole, the Bankruptcy Court separately and independently erred in approving the specific provision in the agreement allowing JIG's $10 million proof of claim in full. (ROA.11812, 27864) That claim was based on JIG's unsecured convertible $5,000,000 note and its purchase of Citadel's $5,000,000 note for $100. (ROA.19126-29, 19193) The Collateral Agent (but not the Debtor) objected to the claim on the grounds that the notes had converted to equity as a result of a prepetition equity financing and that JIG lacked the requisite consents to acquire the note from Citadel. (ROA.15229-35) In approving the JIG Agreement, and thereby allowing JIG's proof of claim over the Collateral Agent's objection, the Bankruptcy Court failed to make the determinations the Bankruptcy Code requires when claims are contested.

Section 502(b) provides that "if … objection to a claim is made, the court, after notice and hearing, *shall determine* the amount of such claim ... as of the date

of the filing of the petition, and shall allow each claim in such amount, except to the extent" certain enumerated conditions exist. 11 U.S.C. § 502(b) (emphasis added). Relying on section 502(b), this Court held in *Official Committee of Unsecured Creditors v. Moeller (In re AGE Refining Corp.)*, 801 F.3d 530 (5th Cir. 2015), that "the bankruptcy court erred" in denying an unsecured creditors committee's objection to a secured creditor's claims and approving a settlement agreement "without making a section 502(b) determination." *Id.* at 543. In committing this error, the bankruptcy court "defied the statute's plain command" because "the Committee had a right to have the bankruptcy court 'determine the amount of' [the creditor's] allowed claim before it approved the Settlement Agreement." *Id.* The same error occurred here: The Collateral Agent had a statutory right to a judicial determination of the validity and extent of JIG's claim, but the Bankruptcy Court erroneously approved the JIG Agreement (including its allowance of the claim) without making any section 502(b) determination.

To be sure, this Court in *Moeller* ultimately held that "the error complained of [in that case] was harmless" because the bankruptcy court—"while not compliant with the statute"—did provide the Committee "with notice and a hearing regarding its objection, allowing it to develop the record fully." *Id.* Indeed, the Committee's appeal did not "seek a right to adduce evidence to be fully heard and receive a ruling on its objections." *Id.* But that is not the case here. As the Trustee admitted at the

40

hearing on the motion to approve the JIG Agreement, the Collateral Agent "ha[s] not yet had a hearing on [its] objection"; "[n]o one has done discovery on that objection"; and indeed "the whole matter is stayed." (ROA.26761) Thus, in approving the allowance of JIG's claim as part of JIG's agreement with the Trustee, the Bankruptcy Court had nothing to go on other than the Trustee's subjective belief that the unsecured claimants "ha[ve] the better argument" than the Collateral Agent concerning the validity and extent of JIG's claim. (*Id.*)

Not only was the Bankruptcy Court's handling of the JIG claim procedurally harmful to the Collateral Agent, it was substantively harmful as well.  In contrast to *Moeller*, where none of section 502(b)'s exceptions to claim allowance were present, *see* 801 F.3d at 543 n.40, the Collateral Agent had a powerful argument that JIG's claim was "unenforceable against the debtor ... under any agreement or applicable law," *see* 11 U.S.C. § 502(b)(1), because the unsecured notes had converted to equity before the bankruptcy filing. Allowing the Collateral Agent the right "to be fully heard and receive a ruling on its objections" to JIG's $10 million claim, *see* 801 F.3d at 543, was especially critical given the Trustee's own effort to reclassify the Collateral Agent's secured claim as unsecured (and thus put it in competition with JIG). By depriving the Collateral Agent of its statutory right to a full record and an express determination under section 502(b) as to the validity or invalidity of JIG's unsecured claim, the Bankruptcy Court committed another reversible error.

**D.    The Bankruptcy Court erred in concluding that the JIG Agreement was in the best interests of the estate.**

Finally, apart from the legal errors in the Bankruptcy Court's decision to approve the JIG Agreement, the court's analysis of whether the agreement was in the best interest of the estate was so deficient as to be legally erroneous.

**1.    By focusing on Rule 9019's factors for litigation compromises, the court applied inappropriate factors and reached largely irrelevant conclusions.**

The Bankruptcy Court recognized that in deciding whether to approve the JIG Agreement, it was required to "apprise[]" itself "of all necessary facts for an intelligent, objective, and educated evaluation." (ROA.11777) (citing *Jackson Brewing*, 624 F.2d at 605) The court was likewise required to consider the "appropriate factors" in its analysis—or else it would abuse whatever discretion it had. *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 552 F.2d 601, 603 (5th Cir. 1977); *see also Am. Bankers Life Assurance Co. of Fl. v. Overton*, 128 F. App'x 399, 402 (5th Cir. Apr. 21, 2005) ("When a district court fails to consider" legally appropriate factors "*on the record,* we have consistently made clear that it abuses its discretion.") (emphasis in original, citing cases). Here, the Bankruptcy Court's attempt to shoehorn its analysis of the JIG Agreement into Rule 9019 forced it to consider *inappropriate* factors and caused it to reach conclusions that were largely *irrelevant*.

42

The court's choice to analyze the appropriateness of the JIG Agreement under the factors for evaluating "compromises" of litigation under Rule 9019 created a fatal mismatch—because there was no actual or threatened litigation between the Trustee and JIG to "compromise." That mismatch infected the entirety of the court's analysis. For example, the first two of these factors require bankruptcy courts examining a litigation settlement to determine the "probability of success in the litigation" as compared to any "uncertainty in fact and law" and "the complexity," "likely duration," and "expense" of prosecuting such "litigation" to final judgment. (ROA.11778 n.16) (citing *Jackson Brewing*, 624 F.2d at 602) But the court could not properly analyze the JIG Agreement under these factors when there was no litigation between the contracting parties—and therefore no way to weigh any compromise against the potential risks and rewards of pursuing the litigation to conclusion.

The only litigation the court did examine to determine its "probability of success" was the litigation of estate claims *"proposed"* under the JIG Agreement— litigation that was not between the contracting parties and was merely contemplated, not settled, under that agreement. (ROA.11785-89) And in all this, the court *did not* analyze the only "settlement" that the JIG Agreement actually claimed to have achieved—the allowance of JIG's proof of claim despite the Collateral Agent's objection. Thus, the court's focus on Rule 9019's factors for examining litigation

settlements ultimately proved nothing but a distraction from the analysis the court *should* have undertaken: determining whether the JIG Agreement was in the best interest of the creditors because it was the *best deal* the Trustee could get. The court's focus on inapplicable factors made its conclusions entirely erroneous and largely immaterial.

The Bankruptcy Court's decision to view the JIG Agreement through the lens of a litigation settlement also led it to analyze the remaining 9019 factors with too deferential a touch. This Court requires bankruptcy courts to determine "whether the compromise serves the paramount interest of creditors" and is not the product of "fraud or collusion"—requiring "deference" to their "reasonable views" while granting no creditor a right to "veto" the transaction. (ROA.11778 n.16) (citing *Foster Mortgage*, 68 F.3d at 917-18) The Bankruptcy Court deemed these requirements satisfied merely because the JIG Agreement was the product of "arms-length bargaining" and because the court "consider[ed] the amount of creditor support" for the agreement. (ROA.11789-90) And it deemed the support of *only two* creditors sufficient (even when the remaining creditors overwhelmingly opposed the agreement) simply because that was two more than those who supported the compromise this Court upheld in *Foster Mortgage*—which "was undertaken without the participation of *any* creditor." (ROA.11789-90) (emphasis in original, citing 68 F.3d at 918)

44

Such deference to a trustee's settlement might be appropriate if the court were analyzing a typical compromise of litigation between a trustee and another party—one in which other creditors would not be affected beyond their receipt of any funds that the settlement brings into the estate. But such deference is wholly *inappropriate* when creditors' legal rights are adjudicated in the "settlement" without their consent—and their potential for recovery is wholly controlled by a litigation target concerned only with protecting its own interests.

In those very different circumstances, a more rigorous inquiry is required. A bankruptcy court must *at least* consider whether the proposed agreement's adjudication of third-party rights was legal—or whether creditors should be afforded some or all of the protections of Chapter 11. *See Continental Air Lines*, 780 F.2d at 1226. The court should also examine the potential for conflicts of interest involving the parties to the agreement. And no bankruptcy court should ever approve an agreement in which the parties were as deeply conflicted as JIG and the Trustee (who used the settlement proceeds to pay himself and his counsel millions of dollars in fees). The Bankruptcy Court's failure to make any of these inquiries rendered its analysis incomplete and inappropriate, requiring that its approval of the JIG Agreement be reversed. *See Jackson Brewing*, 624 F.2d at 602-03; *see also Valucci v. Glickman, Berkovitz, Levinson & Weiner (In re Glickman, Berkovitz, Levinson & Weiner)*, 204 B.R. 450, 455 (E.D. Pa. 1997) (holding that bankruptcy court's failure

45

to appropriately analyze Rule 9019 factors required vacatur of compromise); *In re Douglas J. Roger, M.D., Inc., APC*, 393 F. Supp. 3d 940, 967-68 (C.D. Cal. 2019) (same).

### 2. The Bankruptcy Court failed even to consider the Collateral Agent's superior competing offer.

To the extent the Bankruptcy Court was permitted to weigh the JIG Agreement against other available alternatives in determining whether it was in the best interest of creditors, the court was at least required to apprise itself "of all necessary facts" to make "an intelligent, objective, and educated evaluation." (ROA.11777) (citing *Jackson Brewing*, 624 F.2d at 605) But the court failed to do so. After telling all the parties in interest that it was time to "put up or shut up" if they "wished to propose that the estate should go down a different path" (ROA.11784), the Bankruptcy Court completely ignored the superior competing offer that the Collateral Agent did put up (ROA.15667-68).

The Bankruptcy Court claimed that the objecting parties had "declined" to "meaningfully" engage with the opportunity to better the JIG Agreement. (ROA.11791) But the Collateral Agent made a final proposal that was meaningfully better in several respects. For one thing, the Collateral Agent's offer price dwarfed that of JIG: Whereas JIG offered $6 only million in cash to obtain "control" of the estate causes of action and $100,000 for the GloriFi name and subsidiaries

(ROA.16064), the Collateral Agent's final proposal provided over $4 million in cash and a credit bid for an additional $20 million (ROA.15667-69).

The Collateral Agent was somewhat hampered in formulating its credit bid because, at the time the Bankruptcy Court had told creditors to "put up or shut up," the court had not yet resolved the adversary proceeding and its challenge to the existence and extent of the Collateral Agent's lien on the Debtor's assets. Yet even at that time, the Collateral Agent reasonably anticipated that the value of the lien and the corresponding credit bid would far exceed JIG's $6 million offer—and he was proven correct when the court later determined that the amount of the Collateral Agent's secured claim was over $10.3 million. *See Seidel v. Neugebauer, et al.*, No. 24-03038-MVL (Bankr. N.D. Tex.) (Dkt. No. 563 at 95-96).

The Collateral Agent's final proposal also provided a guarantee of recovery for junior creditors that was absent from the JIG Agreement. While the Collateral Agent's offer to contribute $4 million was slightly less than the $6 million offered by JIG, the Collateral Agent's cash offer included $250,000 reserved exclusively for unsecured creditors: a willing sacrifice by the secured creditors for unsecured creditors' benefit. (ROA.15666-69) By contrast, the $6 million that JIG offered was reserved for payment of administrative claims and litigation expenses and would have to be repaid out of recoveries from estate litigation—with monthly interest— before creditors received anything. (*See* ROA.16064, 27863) Accordingly, by any

47

measure, the Collateral Agent's final proposal was superior. The Bankruptcy Court should have considered it—and erred in approving the JIG Agreement without doing so.

> **3.      The JIG's Agreement's essential terms were inferior to both the Trustee's previous settlement and the Collateral Agent's final proposal.**

Even putting aside the superiority of the Collateral Agent's final proposal, the JIG Agreement was still inferior by comparison to all alternatives because it anticipated that estate causes of action would be asserted only against *some* of the potential wrongdoers rather than *all* of them. And the Bankruptcy Court's reasons for disregarding this disadvantage are deeply flawed.

The Bankruptcy Court emphasized the Trustee's testimony that the JIG Agreement "brings more money into the estate" than the Trustee's previous settlement with Neugebauer and the Collateral Agent (although less than the Collateral Agent's final proposal). (ROA.11754) But that additional cash also came with more expenses than the Neugebauer-Collateral Agent settlement—because, unlike that settlement, the JIG Agreement required the continued prosecution of the Trustee's adversary proceeding against the Collateral Agent and Neugebauer. (ROA.15002-03, 27862) And apart from that expense, any recovery for the unsecured creditors who filed claims would be diluted by JIG's own $10 million unsecured claim, which the JIG Agreement allowed in full. (ROA.26713, 27864)

But these differences in up-front cash and expenses between the two agreements pale in comparison to the greater potential recovery available from pursuing all the estate's causes of action against all the potential wrongdoers instead of just a subset of them. Despite these differences, the Bankruptcy Court deemed it inconsequential for the Trustee to assign "control" over the estate causes of action to JIG's Agent—even though the Agent would not prosecute any claims against JIG and its allies—because the court credited the Trustee's conclusion that it would be better to "choose one 'storyline' to pursue" through the litigation. (ROA.11786-87, 11792) That justification never made sense when the Trustee had earlier concluded that "colorable causes of action exist[ed] against *everyone* that the proverbial finger has been pointed at, including Neugebauer *and* the early investors [including JIG]." (ROA.14996, 16061) (emphasis added)

Neither the Bankruptcy Court nor the Trustee identified anything that would be inherently contradictory in pursuing litigation against *all* of these potential wrongdoers. The court seemed to view the case in terms of two mutually exclusive extremes in which Neugebauer was either a hero or a villain: He could be a "brilliant entrepreneur," "who although eccentric, was singularly driven to have GloriFi succeed," "put his and his family's money on the line" when others refused, and had "the clarity of purpose to see it across the finish line" (ROA.11785-86); or he was a rogue CEO with an "unorthodox management style," who "disregard[ed] corporate

49

formalities," engaged in "self-dealing," and had an "unyielding desire not to lose control" (ROA.11785). But the Trustee was never required to choose between these extremes because there were *others* who contributed to the Debtor's demise— including the "co-founders and co-investors" who "allegedly conspired to steal the Debtor's trade secrets and intellectual property to start competing businesses." (ROA.11768)

The need to commit to a single "storyline" makes even less sense given that each storyline could be asserted in different lawsuits in different forums brought by different named plaintiffs. And all potential wrongdoers would likely end up in the same lawsuit anyway as a result of third-party complaints and responsible third-party designations. Given that reality of litigation, the only real question is whether it makes more sense to pursue a path allowing suit to be brought against all potential wrongdoers—thereby maximizing the potential recovery for the estate—or to pursue only a subset of those potential wrongdoers (who would point to any of those that had not been sued to reduce their own share of responsibility)—thereby *diminishing* the estate's potential recovery. There is ultimately no question which path is in the best interest of the estate, and the Bankruptcy Court erred by approving the wrong one.

**IV.** **At a minimum, the Bankruptcy Court should have conferred derivative standing on the Collateral Agent to prosecute claims that JIG and the Trustee were unwilling to assert.**

In defending the JIG Agreement against the Collateral Agent's contention that it impermissibly allowed the Trustee to abdicate his fiduciary duty by transferring control of claims to JIG and its Agent, the Bankruptcy Court characterized this arrangement as nothing more than the conferral of "derivative standing" on JIG's Agent. (ROA.11798-801) Under that concept, a bankruptcy court can allow a creditor to assert a claim on behalf of the debtor's estate when the claim is colorable, the trustee has unjustifiably refused to pursue the claim, and the creditor receives leave to sue from the bankruptcy court. (ROA.11800, citing *Louisiana World Exposition, Inc. v. Fed. Ins. Co.* (*In re Louisiana World Exposition, Inc.*), 858 F.2d 233, 254 (5th Cir. 1988)). Finding derivative standing to be applicable in the Chapter 7 context, the Bankruptcy Court determined that the three elements articulated in *Louisiana World* "would be satisfied." (ROA.11801) Although this analysis was facially erroneous as applied to the JIG Agreement—because JIG's Agent would be suing in the name of the Trustee, *not* derivatively on behalf of the Debtor's estate (ROA.27861)—it nonetheless demonstrates that the Bankruptcy Court, at the very least, should have granted the Collateral Agent derivative standing to pursue the claims against the DEGA Defendants that the Trustee and JIG were unwilling to assert.

51

Courts imbue creditors with derivative standing based on elements similar to those in *Louisiana World*, including:

- the creditor petitioned the trustee to bring the claims and the trustee refused;

- the creditor has claims that are colorable;

- the creditor sought permission from the bankruptcy court to initiate an adversary proceeding; and

- the trustee unjustifiably refused to pursue the claims.

*See PW Enterprises, Inc. v. No. Dakota Racing Commission, Inc.* (*In re Racing Services, Inc.*), 540 F.3d 892, 898, 900 (8th Cir. 2008) (citing *Louisiana World* as one of many cases to recognize derivative standing). "[I]n most cases creditors will readily satisfy the first three elements without much difficulty." *Id.* at 900.

Here, the Bankruptcy Court agreed with the Collateral Agent that the first three elements were satisfied: the Collateral Agent did demand that the Trustee pursue the claims against the DEGA Defendants; the Trustee admitted the claims are colorable; and the Collateral Agent sought permission from the court to initiate suit (or pursue the existing DEGA Litigation) on behalf of the estate. (ROA.28916) But the court held that the Collateral Agent failed to establish the fourth element—that the Trustee had *unjustifiably* refused to pursue the claims against the DEGA Defendants—because the Trustee acted reasonably in entering into an agreement that "sold/compromised" the right to assert those claims. (*Id.*) That reasoning is entirely circular, and it misapplies the law to an erroneous view of the facts.

52

Even when a trustee lacks the resources to investigate and pursue colorable claims—as was the case here—that alone does not negate a creditor's contention that the trustee's refusal to pursue the claims was unjustified. As the Sixth Circuit aptly stated:

> Just as conflicts of interest may lead to underenforcement of avoidance claims by debtors-in-possession in Chapter 11 proceedings, a lack of available funds may lead to underenforcement by trustees in Chapter 7 proceedings. In this situation, we believe that bankruptcy courts should be able to authorize derivative standing for creditors willing and able to prosecute colorable claims that may enhance the value of the bankruptcy estate in Chapter 7 proceedings.

*Hyundai Translead, Inc. v. Jackson Truck & Trailer Repair, Inc.* (*In re Trailer Source, Inc.*), 555 F.3d 231, 244 (6th Cir. 2009). In recognition of these potential benefits from bestowing derivative standing on creditors, courts must perform a "cost-benefit analysis" in determining whether the trustee unjustifiably refused to bring a creditor's proposed claims—evaluating such factors as the probability of success and financial recovery; the creditor's proposed fee arrangement; and the anticipated delay and expenses to the estate in initiating and continuing the litigation. *In re Racing Services*, 540 F.3d at 901.

But the Bankruptcy Court considered none of these cost-benefit factors—and had it done so, it would have been compelled to grant the Collateral Agent derivative standing to prosecute the DEGA Litigation on behalf of the estate. The Trustee

53

acknowledged that the claims against the DEGA Defendants were colorable, and if successful, would generate millions (if not billions) of dollars to the estate for causing the Debtor's demise. (ROA.14996, 16061) Moreover, pursuing the claims would cost the estate nothing because the Collateral Agent itself would engage counsel under a hybrid fee arrangement, with litigation funding supporting the hourly fee component and all expenses. (ROA.28635) As with any derivative claim, the Collateral Agent then would return 100% of any litigation proceeds to the estate after paying attorney's fees and reimbursing any litigation funding. (*Id.*) And pursuing the derivative claims against the DEGA Defendants would cause no delay to the estate because those claims would be litigated in the same time frame as JIG's claims against Neugebauer and others. (*Id.*)

Finally, the Collateral Agent's request for derivative standing could not legitimately be denied on the ground that the DEGA Litigation was filed before permission was sought to do so. Any such argument would "confuse[] the effect of filing a suit with the effect of its prosecution—only the latter threatens the efficient administration of the bankruptcy estate." *In re Racing Services*, 540 F.3d at 904. For that reason, "numerous federal courts grant[] creditors retroactive permission … to file a derivative adversary complaint." *Id.* (citing cases). And the notion that pursuing the DEGA Litigation would somehow decrease the value of the causes of action against Neugebauer (ROA.11786-87, 11792) simply makes no sense. Even

54

assuming both sets of lawsuits would present an "alterative 'storyline' of the demise" of the Debtor (ROA.11792), they would be pursued in different forums by different plaintiffs represented by different counsel. Seeking recovery from *all* potential wrongdoers would provide benefits to the estate at no perceivable cost, and conferring derivative standing on the Collateral Agent will indisputably achieve that outcome.

## CONCLUSION

For the reasons stated above, the Court should reverse the Bankruptcy Court's Order Granting Trustee's Motion for Approval of Compromise and Settlement with, and Sale to, Jackson Investment Group LLC, render judgment conferring derivative standing on the Collateral Agent to pursue estate claims against the DEGA Defendants, and remand the case for further proceedings. Additionally (or alternatively), the Court should grant the relief requested in the Debtor's appellate brief relating to the Bankruptcy Court's denial of the motion to convert the case to Chapter 11.

Respectfully submitted,

*/s/ Ryan Downton*

**Ryan Downton**
State Bar No. 24036500
Ryan@TheTexasTrialGroup.com
**The Texas Trial Group, PC**
875 Carr 693, Ste. 103
Dorado, Puerto Rico 00646
Telephone: 512-680-7947

*Counsel for WPI Collateral
Management, L.L.C.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 21, 2025, this Brief was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the Appellate CM-ECF System. Participants in this case who are registered CM-ECF users will be served electronically by the Appellate CM-ECF System.

*/s/ Ryan Downton*

**Ryan Downton**

**CERTIFICATE REGARDING PRIVACY REDACTIONS AND VIRUS SCANNING**

The undersigned certifies that: (1) all required privacy redactions have been made in this brief, in compliance with 5TH CIR. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, in compliance with 5TH CIR. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*/s/ Ryan Downton*

**Ryan Downton**

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

1. This brief complies with the type-volume limit of FED. R. APP. P. 32(a)(7)(B) because, excluding the parts of the brief exempted by FED. R. APP. P. 32(f):

   ☒    it contains 12,948 words.

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

   ☒    it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14 pt. Times New Roman (and 13 pt. for footnotes).

*/s/ Ryan Downton*

**Ryan Downton**

*Attorney of Record for WPI
   Collateral Management, L.L.P.*

November 21, 2025

57